CHELSEA INVESTMENT GROUP LLC v CITY OF CHELSEA

Docket No. 288920. Submitted April 6, 2010, at Detroit. Decided April 27, 2010, at 9:05 a.m.

Chelsea Investment Group L.L.C. brought an action in the Washtenaw Circuit Court against the city of Chelsea and Chelsea City Manager Michael Steklac, alleging that defendants' temporary inability to provide sufficient water and sewer capacity to a proposed condominium project pursuant to the parties' planned unit development (PUD) agreement constituted a breach of contract, an unlawful taking of the property without just compensation, and gross negligence. The temporary lack of capacity had led the Department of Environmental Quality (DEQ) to impose a temporary moratorium on development, which caused Pulte Land Company, with whom plaintiff had signed a purchase agreement for the proposed home sites, to terminate the contract after the first of three anticipated phases had been completed. Defendants and plaintiff filed cross-motions for summary disposition. The trial court, David S. Swartz, J., denied plaintiff's motion and granted defendants' motion in part, ruling that plaintiff's negligence claim was barred by governmental immunity under MCL 691.1407(2). After a bench trial, the court ruled that although plaintiff had not established its taking claim, defendants were liable for breach of contract, which entitled plaintiff to $2,276,621.44 in damages, $330.717.80 in interest through September 3, 2008, and interest after that date as calculated under MCL 600.6013(8) until the judgment was satisfied, in addition to costs and sanctions plus interest on the same terms. Defendants appealed, and plaintiffs cross-appealed.

The Court of Appeals *held*:

1. The trial court did not clearly err by ruling that defendants had breached the PUD agreement. The agreement indicated that the existing wastewater treatment plant was adequate to handle the proposed development and specified that the city would expand its water capacity without delaying the development itself or the issuance of related approvals or permits. However, after plaintiff submitted its plans, defendants could not timely approve them because their wastewater treatment plant and water mains

still lacked the necessary capacity. This failure to provide timely approval was the most direct cause of plaintiff's harm.

2. The trial court did not err by awarding plaintiff damages for the second planned phase of the development. The amount awarded was not speculative but was based on the terms of the purchase agreement, and evidence indicated that Pulte would have completed this phase had defendants approved the site plan and offered all the lots at issue.

3. The trial court did not err by failing to award plaintiff damages for the third planned phase of the development because, given the evidence that Pulte was uncertain whether it would move forward with this phase of the development, it cannot be said with certainty that plaintiff's loss of the profits from this phase was the result of defendants' breach of contract.

4. The trial court erred by requiring interest to be calculated at six-month intervals on July 1 and January 1. The plain language of MCL 600.6013(8), which permits the award of interest on a money judgment, indicates that interest must be calculated at six-month intervals from the date the complaint is filed using the interest rates announced on either July 1 or January 1, whichever immediately precedes the six-month calculation date. The conflicting interpretation of the State Court Administrative Office is not entitled to deference because it conflicts with the plain statutory language.

5. Defendants' failure to issue plaintiff permits and approvals during the DEQ-imposed moratorium on development did not constitute a taking that required compensation because plaintiff was not singled out to bear the burden of the regulation. Further, plaintiff presented no evidence demonstrating the extent to which the value of the land at issue was diminished during the moratorium. Finally, plaintiff could not have established that the regulation interfered with its distinct, investment-backed expectations because it was not reasonable to expect that the development would not be subject to obtaining approvals for each stage. For the same reasons, defendants' failure to issue the necessary permits and approvals did not violate plaintiff's substantive due process rights.

6. The trial court did not err by dismissing plaintiff's gross negligence claim against Steklac on governmental immunity grounds because, given that he actively sought solutions for both the wastewater and water capacity issues, the evidence did not indicate that his conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

Affirmed in part, vacated in part, and remanded for further proceedings.

INTEREST — MONEY JUDGMENTS — CALCULATION OF INTEREST ON MONEY JUDG-
    MENTS.

The statutory provision governing awards of interest on money
judgments requires interest to be calculated at six-month intervals
from the date of filing the complaint at a rate of interest equal to
one percent plus the average interest rate paid at auctions of
five-year United States treasury notes during the six months
immediately preceding July 1 and January 1; for example, interest
for a complaint filed in August 2008 would be calculated in
February 2009 using the January 1, 2009, rate, and would be
calculated again in August 2009, using the July 1, 2009, rate (MCL
600.6013[8]).

*Bodman LLP* (by *Jerold Lax*) and *Jackier Gould PC*
(by *Dean J. Gould*) for plaintiff.

*Plunkett Cooney* (by *Mary Massaron Ross* and *Hilary
A. Dullinger*) for defendants.

Before: JANSEN, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM. In this contract action, defendants, city of
Chelsea and Michael Steklac, appeal and plaintiff, Chelsea
Investment Group L.L.C., cross-appeals the trial court's
order entering judgment in defendants' favor after a
bench trial. We affirm in part and vacate in part.

I. FACTS AND PROCEDURAL HISTORY

In 2000, plaintiff acquired 157 acres of undeveloped
real property in Chelsea, Michigan, by land contract.
Plaintiff paid $500,000 of the $5 million purchase price at
closing, leaving $4,500,000 to be paid in equal semiannual
installments over the next five years.[1] Plaintiff also
agreed to pay the property taxes.

[1] The land was not immediately released to plaintiff; rather, it was
released incrementally with subsequent payments. However, the contract
permitted plaintiff to develop infrastructure on the property during the
term of the land contract.

After entering into the land contract, plaintiff petitioned the city of Chelsea to rezone the property as a planned unit development (PUD). Plaintiff also petitioned for site plan approval for the purpose of developing single-family units. The city's planning commission issued two resolutions that made findings and recommendations on plaintiff's petitions. Ultimately, the planning commission recommended that defendant approve the rezoning request and the proposed development as long as plaintiff met all the provisions in the resolutions. Accordingly, in November 2001, the property was rezoned. Further discussions ensued concerning the site plan and, in April 2002, plaintiff proposed a detailed plan for the construction of a development called "Heritage Pointe," which would contain 352 single-family condominiums.

### A. THE PUD AGREEMENT

In April 2003, the city approved this site plan, and plaintiff and the city entered into a PUD agreement, which was recorded in the Register of Deeds Office. The PUD agreement granted plaintiff site plan approval for all 352 residences and required the development of Heritage Pointe to be carried out in five separate phases, each of which contemplated the development of a certain number of lots. Under the agreement, each phase was conditioned on plaintiff's obtaining site plan approval for the project from the city. In particular, no zoning or building permits could be issued in a phase until "the public water mains, public sanitary sewers, and all appurtenances necessary to support that phase ha[d] been installed," approved, and accepted by defendant.

The PUD agreement was divided into several parts: recitals, statements of mutual agreement, plaintiff's

obligations under Part A, and the city's obligations under Part B. The recitals provided an account of what had occurred over the last several years with regard to the subject property. The statements of agreement indicated that the PUD zoning designation would "consist of the findings and recommendations of the [city] Planning Commission adopted on November 21, 2001 . . . ." In other words, the PUD agreement incorporated a November 2001 resolution of the city's planning commission. Part 3 of the resolution stated, in relevant part:

> b. Sanitary sewer — The existing sanitary sewer is adequate to handle the proposed development. However, the [waste water treatment plant] must be expanded and 10 acres of additional land is needed for that expansion. . . .
>
> c. Water — Existing water mains cannot provide volumes or pressure needed for the proposed 352 houses.

Part A of the PUD agreement set forth plaintiff's contractual obligations and provided conditions under which plaintiff would develop the property. Plaintiff, for instance, was required to donate 10 acres of land to defendant for the expansion of the city's wastewater treatment plant (WWTP) and to convey a conservation easement of approximately 30 acres. Further, Part A of the agreement indicated that it was defendant's duty to expand the existing water capacity. Paragraph 4 of the PUD agreement stated:

> The [city] is in the process of extending the existing 12" water main down Elm Street . . . which 12" Water Main Work will be completed by the [city], at the [city's] expense, *in sufficient time so as not to interfere with or delay [plaintiff's] development of the Property.* In consideration of the donation/conveyance of the WWTP property . . . , the [city] agrees that neither the Developer . . . nor any of the owners of lots/units in the Development will ever be required to install (or pay to install) any offsite improve-

ments with regard to the provision of water to the Development and, *if there is ever a need to increase the water capacity to the Development, the* [city] *will be responsible for installing any and all offsite improvements related to increasing the water capacity to the Development without contribution of any kind from the Developer* . . . or any owners of lots/units in the Development . . . .

Part B of the PUD agreement contained further obligations of the city. It stated, in full:

The [city] agrees to do the following *in a timely manner so as not to delay any approvals* or the issuance of any permits or certificates of occupancy in the Development:

1. Approve PUD zoning for the Property, based on the Area/Site Plan.

2. Extend the 12" water main in Elm Street, at the [city's] expense, to the west line of the Property by Elm Street and Taylor Lane.

3. Mill and apply a 2" overlay to, at the [city's] expense, the remaining segment of Taylor Lane, between Dexter Chelsea Road and the South line of the Property, in accordance with [city] standards and specifications so as not to delay or interfere with the Development.

4. *Construct and perform those requisite tasks, at the* [city's] *expense, as outlined above, in connection with the installation of any offsite utilities.*

5. Accept street and public utilities as public facilities upon inspection, testing, submission of as-built drawings, and approval by the [city] Engineer.

6. To obtain any offsite easements in connection with any requisite improvements to Dexter/Chelsea Road as provided above. [Emphasis added.]

### B. THE PULTE PURCHASE AGREEMENT

In May 2004, plaintiff entered into a purchase agreement with Pulte Land Company for the construction of the residential units. Under the purchase agreement,

Pulte agreed to purchase the home sites from plaintiff for $23,000 per lot. Pulte was to purchase the lots and construct the homes in three phases, which roughly corresponded with the five phases in the PUD agreement. Specifically, Phase One was Pulte's purchase of 76 lots, which encompassed the first phase in the PUD agreement; Phase Two was Pulte's purchase of 167 lots, encompassing the middle two phases in the PUD agreement; and Phase Three was Pulte's purchase of 109 lots, encompassing the final two phases in the PUD agreement.

Importantly, Pulte's purchase of the sites was conditioned on plaintiff's securing governmental approval for each phase. The purchase agreement also required Pulte to pay a $250,000 deposit, which would be fully refundable if plaintiff failed to obtain the necessary governmental approvals within certain time limits. For example, once Pulte closed on Phase One, plaintiff had a year from that date to obtain the necessary approvals for Phase Two. In addition, Pulte also agreed to pay the property's taxes.

### C. PERFORMANCE

Pulte closed on Phase One by August 2004. Pulte was ready to begin work on Phases Two and Three beginning in the summer of 2005. Thus, plaintiff sought the city's approval of the plans for those phases. Plaintiff's engineer submitted the final plans to the city in March 2005.

In May 2005, the city informed plaintiff that the WWTP lacked sufficient capacity for the development. Apparently, according to defendant Michael Steklac, the city manager, the city was aware of a problem with the reverse osmosis (RO) system, a treatment that provided the city with soft water, as early as 2003 or 2004.

However, this problem related to having to change the system's filter too frequently; Steklac was not aware of the capacity issue until April or May 2005. Up until that point, Steklac had believed, on the basis of the advice of the city's engineers, that the earliest the city would need to address the WWTP capacity issue was within five years of 2004. Steklac was surprised when he learned of the WWTP capacity issue in May 2005.

Steklac worked with plaintiff in attempting to resolve the WWTP issue. Steklac met with the city's engineers, considered plaintiff's proposals, and submitted plaintiff's proposals to the Michigan Department of Environmental Quality (MDEQ) for consideration. Apparently, the city council refused to adopt and implement plaintiff's suggestion that it cease using the RO system. Had the city agreed to turn the RO system off, the additional necessary capacity would have become available, thereby allowing the MDEQ to issue a permit. However, according to Steklac, stopping the RO system was not a viable option. Although keeping the RO system running was not a matter of health and safety but an aesthetic issue, the city council voted to continue the system because citizens were paying for soft water and the city was obligated to provide that water. Thus, the solutions contemplated were explored in the context of keeping the RO system online.

In June 2005, the city learned that it also had a water capacity issue. The city's new water superintendent had found that the city was reporting a greater water capacity to the MDEQ than it really had. After the water superintendent informed the MDEQ of the lack of capacity, the MDEQ issued a moratorium on development in July 2005. The city informed plaintiff of the water capacity problem in July 2005. According to Steven Fisher, plaintiff's president, these capacity prob-

lems were a complete surprise. Although plaintiff had been aware of water moratoriums in 1999 and 2000, it had taken steps to make certain that its development would not be affected by any future moratoriums and had been "very sensitive" to the issue.

Plaintiff and the city continued to work together to solve these problems. At one point, the city indicated that 85 lots might be available. Pulte affirmed that it would take fewer than the 167 lots that it was promised under Phase Two because stopping its operations would be costly. However, the city reneged on the offer of 85 lots.

Despite these efforts, by August 2005, a year after Pulte had completed Phase One, plaintiff still had not obtained the necessary governmental approvals that would permit Pulte to proceed with the project. Thus, Pulte exercised its option under the purchase agreement to terminate the agreement and to receive a full refund of its $250,000 deposit. By March 2006, approximately eight months after the moratorium had been issued, the city resolved both the WWTP and water capacity issues, and the moratorium was removed. Plaintiff mitigated its damages by entering into a contract for the sale of some of the lots with another builder. However, plaintiff was not able to obtain a similar purchase price for the lots.

### D. PRETRIAL PROCEDURE

On February 9, 2006, plaintiff filed a suit against the city and Steklac requesting injunctive and declaratory relief, alleging that defendants had breached the PUD agreement by failing to provide sufficient water and sewer capacity, that defendants' actions constituted an unlawful taking of the property, and that defendants

were grossly negligent in carrying out their duties in a manner that caused plaintiff harm.

In August 2007, defendants and plaintiff filed cross-motions for summary disposition. The trial court denied plaintiff's motion and granted defendants' motion in part, dismissing the portion of plaintiff's claim alleging that defendants had been negligent. According to the court, "strategic actions related to the performance of a contract do not fall within the definition of Gross Negligence . . . that was 'the proximate cause' of plaintiff's injuries." Thus, the court ruled that plaintiff's negligence claim was barred by governmental immunity under MCL 691.1407(2). The court, however, ruled that questions of fact existed as to the remaining counts and, thus, denied summary disposition of these claims. The parties moved for summary disposition again in June 2008, but the trial court denied both parties' motions; in its view, questions of fact existed as to the remaining claims.

### E. BENCH TRIAL

The matter was set for a bench trial on July 25, 2008. The parties stipulated to waive live testimony except as it related to the issue of damages and agreed to submit proposed findings of fact and conclusions of law. At trial, Fisher testified that the total profit plaintiff would have gained if Pulte had completed Phase Two was $2,349,340, as well as an additional $1,504,068 had Pulte completed Phase Three. Fisher stated that Pulte also agreed to pay property taxes, which brought the total plaintiff was to have gained from Phases Two and Three to $3,873,524. Because Fisher was able to sell some of the property to another developer—approximately 45 lots, albeit at a lower price of $18,000 per lot—the damages were reduced by $342,835, result-

ing in total damages of $3,530,689. Fisher also indicated that plaintiff should be reimbursed for the $250,000 deposit that Pulte had paid to plaintiff in contemplation of completing the contract, which plaintiff had to refund.

At the close of trial, the court adopted plaintiff's findings of fact and conclusions of law, except with regard to plaintiff's taking claim. The court concluded that plaintiff could not establish a taking claim, but that it had established a breach of the PUD agreement. It further indicated that plaintiff's damages would be limited to Phase Two.

Before the court entered its judgment, plaintiff moved for costs and attorney fees. In its brief in support, plaintiff argued that interest on the verdict, costs, and attorney fees should be calculated at six-month intervals from the date the complaint was filed, using the relevant interest rate as of January 1 or July 1. Plaintiff contended that this calculation was consistent with the plain language of MCL 600.6013(8), which allows interest on a money judgment and provides:

> Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

In response, defendants argued that MCL 600.6013(8) requires that interest be calculated at six-month intervals, changing on July 1 and January 1. According to defendants, this method of calculation is the correct one because the State Court Administrative Office has interpreted MCL 600.6013(8) in this manner.

Subsequently, the trial court entered its judgment awarding plaintiff $2,276,621 in damages[2] plus interest on that amount "through September 3, 2008, and interest subsequent to that date until the judgment is satisfied in an amount determined pursuant to MCL 600.6013(8)," in addition to costs and sanctions plus interest on the same terms. Defendants appealed and plaintiff cross-appealed the trial court's judgment and order.

## II. DEFENDANTS' APPEAL

Defendants raise two arguments before this Court: that the trial court erred by ruling that the city had breached the PUD agreement and by awarding plaintiff damages. We consider each argument in turn.

### A. BREACH OF CONTRACT

Defendants contend that the trial court erred by concluding that the city had agreed to provide plaintiff with instantaneous access to water under the PUD agreement and therefore breached the PUD agreement by failing to do so. We disagree. We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Ligon v Detroit*, 276 Mich

---

[2] This number was calculated by taking the total profit from Phase Two, plus the $250,000 earnest money deposit and the $20,116 in property taxes, and subtracting the $342,835 that had resulted from plaintiff's mitigation.

App 120, 124; 739 NW2d 900 (2007). A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made. *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007). The trial court's findings are given great deference because it is in a better position to examine the facts. *Id.* Further, to the extent that this matter requires us to interpret the meaning of the PUD agreement, our review is also de novo. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

After our review of the record, we cannot conclude that the trial court clearly erred by ruling that the city had breached the PUD agreement. The agreement, by incorporating the November 21 resolution, noted that the existing WWTP was "adequate to handle the proposed development." With regard to water capacity, the PUD agreement, also through the resolution, indicated that the existing water mains were inadequate to provide the necessary volume of water or the necessary water pressure. However, the city explicitly agreed under Part A of the PUD agreement to expand the water capacity for the development at its own expense in exchange for plaintiff's donation of almost 40 acres of land. Part A, ¶ 4 of the PUD agreement stated in part:

> The [city] is in the process of extending the existing 12" water main down Elm Street . . . which 12" Water Main Work will be completed by the [city], at the [city's] expense, *in sufficient time so as not to interfere with or delay* [*plaintiff's*] *development of the Property.* In consideration of the donation/conveyance of the WWTP property . . . , *the* [*city*] *agrees that . . . if there is ever a need to increase the water capacity to the Development, the* [*city*] *will be responsible for installing any and all offsite improvements related to increasing the water capacity to the Development without*

*contribution of any kind from the Developer . . .* or any owners of lots/units in the Development . . . . [Emphasis added.]

Further, under Part B of the PUD agreement, the city explicitly agreed to "[c]onstruct and perform those requisite tasks, at the [city's] expense, *as outlined above*, in connection with the installation of any offsite utilities" in a *"timely manner so as not to delay any approvals* or the issuance of any permits or certificates of occupancy in the Development . . . ." (Emphasis added.)

Despite its explicit promises not to interfere with or delay plaintiff's development, the city did exactly that. In August 2004, Pulte had completed Phase One and was waiting for plaintiff to obtain the necessary governmental approvals for the next phases of the project. Plaintiff submitted its plans to the city in March 2005, but the city did not approve them. Instead, in May 2005, the city reported that the WWTP lacked capacity and, in July 2005, it told plaintiff that water capacity was also lacking and that an MDEQ moratorium had been issued preventing development. By August 2005, the city still had not resolved the issues or otherwise approved plaintiff's plan, and Pulte exercised its right to terminate its agreement with plaintiff. Under these circumstances, the city's actions interfered with and delayed plaintiff's development of Heritage Pointe. Given the foregoing, we are not definitely and firmly convinced that the trial court made a mistake when it ruled that the city had breached the PUD agreement.

Defendants, however, argue that the trial court erred to the extent it concluded that the city was required to provide "instantaneous access" to water and sewer capacity, or to otherwise provide those services at a certain date. In defendants' view, the city was not

contractually obligated to provide water services or facilities at a certain date because the PUD agreement is "devoid of any timing provision." This argument is unavailing. At the outset, this Court notes that the trial court never ruled that the city was required to provide plaintiff with "instantaneous access" to water under the PUD agreement. Nor are we of the view that the PUD agreement contained such a requirement, or, indeed, any certain or firm date requirement.

However, we cannot agree with defendants' contention that the PUD agreement was devoid of any timing provisions, or that it did not contractually obligate the city to provide such services. While it is true that nothing in the language of the agreement required that water services be available by a certain date, Part A, ¶ 4 of the PUD agreement did contain language that required the city to "install[] any and all offsite improvements related to increasing the water capacity to the Development" if such a necessity arose. And the city further agreed, under Part B of the agreement, to "[c]onstruct and perform those requisite tasks, at the [city's] expense, *as outlined above, in connection with the installation of any offsite utilities*" in a *"timely manner so as not to delay any approvals* or the issuance of any permits . . . ." (Emphasis added.) Nothing in the language of Part B limited this requirement to the specific obligations listed in part B of the PUD agreement. Rather, the phrase "as outlined above," when read in context of the entire agreement and in conjunction with the phrase "in connection with the installation of any offsite utilities," related back to the provisions of ¶ 4. Thus, defendants' attempt to limit the city's duties to those contained in Part B (meaning that the city was not contractually obliged to provide water or sewer capacity), and their accompanying contention that Part B is devoid of any timing provision, fail.

Clearly, the phrase "timely manner," as used in Part B, indicated an intent to provide water services, not at a certain date or instantaneously, but in an amount of time that would not delay approvals or interfere with plaintiff's development. The PUD agreement was not devoid of a timing provision.[3]

Finally, defendants assert that even if the breach did occur, it was not the cause of plaintiff's harm. According to defendants, the cause of plaintiff's harm was the condition of the real estate market. We disagree. To recover in a breach of contract action, a plaintiff must prove that the defendant's breach was the proximate cause of the harm the plaintiff suffered. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). In other words, the breach must be the most direct, natural, and foreseeable cause of the plaintiff's harm. See *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 625; 769 NW2d 911 (2009). Here, the city's failure to provide timely approval consistent with the PUD agreement was the most direct cause of the harm plaintiff suffered. Had the city provided the approvals, Pulte would have proceeded with Phase Two. The fact that Pulte was willing and ready to proceed with Phase Two construction with fewer lots was not

---

[3] Defendants also argue that the trial court erred to the extent it found that the city failed to provide access to water and sewer capacity within "a reasonable time." Defendants' argument is based on the principle that courts may require performance of a contract to be completed within a "reasonable time" if the contract lacks definiteness as to the time of performance. However, the language of the PUD agreement made specific reference to the city's obligation to provide services in a "timely manner so as not to delay any approvals or issuance of any permits . . . ." Thus, given our conclusion that the PUD agreement was not devoid of a timing provision, it is unnecessary for us to assume that the trial court based its conclusion on an application of the principle that courts may infer a reasonable time for performance. Thus, we do not consider defendants' argument.

the result of adverse market conditions, as defendants now argue. Rather, Pulte was willing to do so because the city, at one point, had offered plaintiff and Pulte the opportunity to proceed with 85 lots as opposed to 167. For all the foregoing reasons, we conclude that the trial court did not clearly err by concluding that the city had breached the PUD agreement.

## B. DAMAGES

Defendants next contend that the trial court erred by awarding plaintiff damages for Phase Two. In defendants' view, the award should be vacated because it is too speculative. We cannot agree. We review a trial court's determination of damages after a bench trial for clear error. *Alan Custom Homes*, 256 Mich App at 513. It is true that damages that are speculative or based on conjecture are not recoverable. *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 525; 687 NW2d 143 (2004). However, it is not necessary that damages be determined with mathematical certainty; rather, it is sufficient if a reasonable basis for computation exists. *Id.*

The trial court awarded plaintiff $2,276,621 for Phase Two. The award of damages was not speculative. Rather, it was based on the testimony of Steven Fisher, plaintiff's president, who testified regarding how much profit plaintiff would have realized had Phase Two been completed. It appears from our review of the record that Fisher's computation was based on the terms of the purchase agreement, under which Pulte agreed to pay property taxes and to compensate plaintiff $23,000 per lot. The measure of damages also included Pulte's $250,000 earnest money deposit, minus the amount plaintiff gained from selling some lots to a different

developer. Given this record evidence, we simply fail to see how this measure of damages was speculative.

Further, there is no merit to defendants' contention that the damages were speculative because Pulte did not know whether it would complete Phase Two. In support, defendants cite the testimony of Pulte's representative, Steven Atchinson, who indicated that Pulte was uncertain whether it would acquire more than half the Phase Two lots. However, a review of Atchinson's deposition testimony reveals that Pulte was ready and willing to proceed with Phase Two; the only reason Pulte did not know whether it would complete Phase Two was that the city had not approved plaintiff's site plan and the city had only offered Pulte half the Phase Two lots. Accordingly, the evidence provided permitted a reasonable basis by which to calculate damages, and the trial court did not clearly err. Defendants are not entitled to any relief based on their claims of error raised on appeal.

### III. PLAINTIFF'S CROSS-APPEAL

We now consider plaintiff's arguments raised in its cross-appeal, including its allegations that the trial court erred in measuring damages, in calculating interest, and by dismissing plaintiff's taking and gross negligence claims.

### A. DAMAGES

Plaintiff first contends that the trial court erred by failing to award plaintiff damages for Phase Three. We cannot agree because we are not convinced, after our review of the record, that a mistake has been made. Atchinson testified that Pulte's business plan in 2006 did include all of Phases Two and Three. But Atchinson

also indicated that Pulte was uncertain whether it would move forward with the entire project given the fact that it would become more difficult to invest money over time. Thus, although Pulte was contemplating completion of Phase Three, it remains entirely speculative whether Pulte actually would have closed on Phase Three. See *Ensink*, 262 Mich App at 525. Pulte could have failed to close on phase three for any number of reasons, such as unfavorable market conditions or a change in business plans. Thus, it cannot be said with certainty that plaintiff's loss of the Phase Three profits was the result of defendants' breach of the PUD agreement. Accordingly, the trial court did not clearly err and plaintiff is not entitled to damages for Phase Three.

### B. INTEREST

Plaintiff next asserts that the trial court erred by calculating interest at six-month intervals on July 1 and January 1, inconsistently with MCL 600.6013(8). Plaintiff posits that the statute requires that interest be calculated at six-month intervals from the date of the complaint, using the most immediately preceding interest rate from July 1 or January 1. We agree.

At the outset, we note that it is well established that interest is calculated from the date the complaint is filed. See *Ayar v Foodland Distrib*, 472 Mich 713, 716-717; 698 NW2d 875 (2005). However, when the interest is recalculated under the statute is an issue of first impression.[4] To frame the question more concisely,

---

[4] The Michigan Supreme Court has considered the meaning of MCL 600.6013(8) on numerous occasions but has not considered the particular question before this Court. See, e.g., *Ayar*, 472 Mich at 716-718 (concluding that the plain language of the statute does not preclude attorney fees or costs from the interest calculation measured from the date the complaint is filed); *Morales v Auto-Owners Ins Co (After Remand)*, 469

we must decide whether MCL 600.6013(8) requires interest to be calculated at six-month intervals from the day the complaint is filed or whether it requires interest to be calculated every six months on January 1 and July 1 from the date the complaint is filed. Issues of statutory construction are questions of law reviewed de novo on appeal. *Stabley v Huron-Clinton Metro Park Auth*, 228 Mich App 363, 366; 579 NW2d 374 (1998). Our goal in construing a statute is to discern the intent of the Legislature, as expressed by the words of the statute. *Computer Network, Inc v AM Gen Corp*, 265 Mich App 309, 327; 696 NW2d 49 (2005). We must "presume every word is used for a purpose, and as far as possible . . . give effect to every clause and sentence." *Verizon North, Inc v Pub Serv Comm*, 263 Mich App 567, 570; 689 NW2d 709 (2004). The Court must give all the statute's words their plain and ordinary meanings, unless otherwise defined by the Legislature. See *Stabley*, 228 Mich App at 367. If the meaning of the language is plain and unambiguous, then we must apply the statute as written and not substitute our own policy preferences for those of the Legislature. *Lantz v Southfield City Clerk*, 245 Mich App 621, 626; 628 NW2d 583 (2001).

MCL 600.6013(8) permits an award of interest on a money judgment. It provides:

> Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, *interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal* to 1% plus the average interest rate paid at auctions of 5-year United States treasury *notes during the 6 months*

Mich 487, 491-492; 672 NW2d 849 (2003) (concluding that MCL 600.6013(8) requires calculation of interest on a judgment following a prejudgment appellate delay, without interruption, from the date the complaint is filed).

> *immediately preceding July 1 and January 1*, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney. [Emphasis added.]

In our view, the language of this provision is plain and unambiguous. It requires that "interest on a money judgment . . . [be] calculated at 6-month intervals from the date of the filing of the complaint at a rate of interest equal to 1% plus the average interest rate [of] . . . United States treasury notes during the 6 months immediately preceding July 1 and January 1 . . . ." When this language is parsed, MCL 600.6013(8) simply requires that interest on a judgment be recalculated every six months from the date of the filing of the complaint using the interest rates announced on July 1 or January 1, whichever is "immediately preceding" the complaint's six-month calculation date. For example, interest for a complaint filed in August 2008 would be calculated in February 2009 using the January 1, 2009, rate, and would be calculated again in August 2009, using the July 1, 2009, rate.

Defendants contend that the trial court's calculation should be affirmed. They argue that the proper interpretation of MCL 600.6013(8) mandates that interest be calculated at six-month intervals on July 1 and January 1, starting from the date the complaint is filed. According to defendants, this interpretation is consistent with the Michigan State Court Administrative Office's July 27, 2009, publication entitled "Interest rates for money judgments under MCL 600.6013." With regard to MCL 300.6013(8), it stated:

> Interest is calculated at 6-month intervals on Jan 1st and July 1st of each year, starting from the date the complaint is filed, compounded annually. The interest rate equals the rate paid on 5-year United States treasury notes, as certified by the state treasurer, for the 6 months preceding each Jan 1st and July 1st, plus 1%.

We disagree. This interpretation is plainly contrary to the clear language of the statute, which requires that interest be recalculated at six-month intervals from the date of the complaint, using the immediately preceding interest rate from July 1 or January 1. While some deference is due to an administrative agency's interpretation of a statute it is charged with executing, *Nelligan v Gibson Insulation Co*, 193 Mich App 274, 281; 483 NW2d 460 (1992), an agency's interpretation is not binding on this Court and it cannot overcome the statute's plain meaning, *Ludington Serv Corp v Acting Ins Comm'r*, 444 Mich 481, 503-504; 511 NW2d 661 (1994). Because the State Court Administrative Office's recommendation is contrary to the statute's plain meaning, this Court is not bound to follow it. Thus, the interest on plaintiff's judgment must be recalculated on remand consistently with the language of MCL 600.6013(8).

### C. TAKING CLAUSES AND SUBSTANTIVE DUE PROCESS

Plaintiff next argues that the trial court erred by dismissing its claims that defendants' actions constituted an unlawful taking and violated its substantive due process rights. In particular, plaintiff alleges that defendants engaged in arbitrary action that significantly and adversely affected plaintiff's economic interests in the subject property. Plaintiff alleges that defendants' actions undermined its investment-backed expectations, which were based on defendants' repre-

sentations in the PUD agreement. We disagree. Following a bench trial, we review a trial court's conclusions of law on constitutional issues de novo. *Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 248; 701 NW2d 144 (2005).

Both the Fifth Amendment of the United States Constitution and Const 1963, art 10, § 2 prohibit the taking of private property for public use without just compensation. *Cummins v Robinson Twp*, 283 Mich App 677, 706; 770 NW2d 421 (2009). The Taking Clauses do not prohibit the government's interference with a private individual's property, but require that interferences amounting to a taking be compensated. *Id.* Typically, the government takes private property through formal condemnation proceedings. See *Dorman v Clinton Twp*, 269 Mich App 638, 645; 714 NW2d 350 (2006). However, governmental regulations that overburden a property may also constitute a compensable taking. *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 576; 575 NW2d 531 (1998). Regulatory taking claims that do not rise to the level of a categorical taking[5] are governed by the standard set out in *Penn Central Transp Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978). The balancing test announced in that case requires a reviewing court to engage in an ad hoc factual inquiry, focusing on "(1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct, investment-backed expectations." *K & K Constr*, 456 Mich at 577, quoting *Penn Central*, 438 US at

---

[5] A "categorical" taking occurs when there has been a physical invasion of a landowner's property or when a regulatory taking has deprived an owner of all economically and beneficial use of the land. *Lucas v South Carolina Coastal Council*, 505 US 1003, 1015; 112 S Ct 2886; 120 L Ed 2d 798 (1992). Plaintiff does not assert such a claim in the instant matter.

124. "While there is no set formula for determining when a taking has occurred under this test, it is at least 'clear that the question whether a regulation denies the owner economically viable use of his land requires at least a comparison of the value removed with the value that remains.' " *K & K Constr*, 456 Mich at 588 (citation omitted). Moreover, a mere reduction in the value of regulated property is insufficient by itself to establish that a compensable taking has occurred. *Penn Central*, 438 US at 131; *Dorman*, 269 Mich App at 647.

We agree with the trial court that plaintiff has not satisfied the *Penn Central* test. "The relevant inquiries regarding the character of the government's action is whether it singles [a] plaintiff[] out to bear the burden for the public good and whether the regulation being challenged 'is a comprehensive, broadly based regulatory scheme that burdens and benefits all citizens relatively equally.' " *Cummins*, 283 Mich App at 720 (citation omitted). In this case, the MDEQ imposed a temporary moratorium on the issuance of water and sewer permits because of health and safety concerns arising from the capacity of the WWTP during wet periods. As a result, the city was temporarily precluded from issuing approvals and permits for plaintiff's development. All developers in the area connecting to the water facilities at issue would be subject to the same moratoriums. Thus, plaintiff has failed to establish that the MDEQ moratorium singled it out.

Further, plaintiff has produced no evidence demonstrating the extent to which the land's value was diminished during the moratorium. Even assuming, without deciding, that the value of the land was diminished while the moratorium was in effect, plaintiff still would not be able to establish a taking. This is because the land retained some value, given that plaintiff was

free to use the property in any other way. Further, the fact that plaintiff was not able to realize a profit similar to that which it would have gained under the Pulte purchase agreement does not establish a taking. "The Taking Clause does not guarantee property owners an economic profit from the use of their land." *Paragon Props Co v Novi*, 452 Mich 568, 579 n 13; 550 NW2d 772 (1996).[6]

Finally, plaintiff could not have established that the regulation interfered with its distinct, investment-backed expectations. This is because plaintiff had no reasonable expectation that the development would not be subject to obtaining city approvals for each stage of the development. The PUD agreement explicitly stated that no zoning or building permits could be issued in a phase until "the public water mains, public sanitary sewers, and all appurtenances necessary to support that phase ha[d] been installed," approved, and accepted by the city. Moreover, we note that plaintiff knew problems could arise regarding water facilities, given that the MDEQ had issued moratoriums in 1995 and 2000 and that plaintiff's president had admitted being particularly sensitive to the issue during contract negotiations. Given the foregoing, plaintiff has failed to produce evidence that would satisfy the *Penn Central* test. Accordingly, we conclude that the trial court did not err by concluding that no taking of plaintiff's property had occurred.

---

[6] We also note that, generally, "requiring plaintiffs to obtain building and occupancy permits cannot itself constitute a taking of property." *Cummins*, 283 Mich App at 719. However, in instances of abnormally long delays, even temporary takings may be compensable. See *id.* at 716-717. But no extraordinary delay occurred in the instant case; the MDEQ moratorium was only in effect for a period of eight months. The obvious implication is that once the moratorium was lifted, the property would recover its full value.

Lastly, we also find unavailing plaintiff's related argument that the trial court erred by dismissing its claim that defendants' actions violated plaintiff's substantive due process rights. It is true that both the Fourteenth Amendment of the United States Constitution and Const 1963, art 1, § 17 guarantee that no state shall deprive any person of " 'life, liberty or property, without due process of law.' " *People v Sierb*, 456 Mich 519, 522; 581 NW2d 219 (1998). For the reasons explained in the above analysis, plaintiff has failed to show that it suffered a deprivation of property. Further, even if plaintiff had established such a deprivation, its claim would nonetheless fail because the city's reasons for not issuing the permits were reasonable and legitimate. With regard to the WWTP issue, Steklac testified that the city was obligated to provide its citizens with soft water and it could not increase capacity by stopping the RO system. And, with regard to water capacity, the MDEQ issued the moratorium in July 2005 for health and safety reasons after it learned that the city had been mistakenly overreporting its capacity. For these reasons, plaintiff's substantive due process claim necessarily fails.

### D. GROSS NEGLIGENCE

Plaintiff next argues that the trial court erred by granting summary disposition in defendants' favor as to its gross negligence claim against Steklac. We disagree. It appears from our review of the record that the trial court granted defendants' motion under MCR 2.116(C)(7). We review de novo a motion decided under MCR 2.116(C)(7), which alleges that a claim is barred because of immunity by law. *Bennett v Detroit Police Chief*, 274 Mich App 307, 310; 732 NW2d 164 (2007). " '[S]ummary disposition is precluded where reasonable

jurors honestly could have reached different conclusions with respect to whether a defendant's conduct amounted to gross negligence.' " *Kendricks v Rehfield*, 270 Mich App 679, 682; 716 NW2d 623 (2006) (citation omitted).

In this case, the trial court, citing MCL 691.1407(2), concluded that Steklac's conduct did not fall within the definition of "gross negligence" and therefore plaintiff's negligence claim against him was barred by governmental immunity. MCL 691.1407(2) provides, in part:

> [E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer . . . while in the course of employment or service . . . while acting on behalf of a governmental agency if . . . :
>
> * * *
>
> (c) The officer's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

MCL 691.1407(7)(a) defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Evidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent. *Maiden v Rozwood*, 461 Mich 109, 122-123; 597 NW2d 817 (1999). Rather, there must be evidence that the employee's conduct was reckless. *Id.* And, further, the employee's conduct must be the proximate cause of the plaintiff's injury. *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000).

There is no question in the present matter that Steklac, as city manager of Chelsea, was a public employee. Nor is there any question that Steklac was acting within the scope of his employment while work-

ing with plaintiff with regard to the PUD agreement. Rather, the only issue on appeal is whether Steklac's conduct was grossly negligent. The trial court held that it was not, and we find no reason to disagree. A review of the record reveals that Steklac actively sought solutions for both the WWTP and water capacity issues. Indeed, Steklac testified that he attempted to solve the problem by considering a broad range of solutions proposed by both the city's and plaintiff's engineers. These suggestions were proposed to the MDEQ, but were ultimately found to be unworkable. The fact that a solution was not reached before Pulte exercised its right to terminate the purchase agreement is not evidence that Steklac's conduct was reckless. Nor does the fact that Steklac knew that the WWTP was not operating optimally as early as 2003 or 2004 demonstrate a substantial lack of concern for whether an injury would result. His knowledge of the issue was with regard to the proper functioning of the RO system, not with regard to the system's capacity. Thus, it cannot be said that Steklac intentionally misled plaintiff with regard to the WWTP's capacity. Therefore, we affirm the trial court's ruling that Steklac was entitled to governmental immunity on plaintiff's claim of gross negligence.

Affirmed in part, but vacated with respect to the trial court's calculation of interest. Remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.