*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ML, by Conservator PAUL LATUNSKI,

        Plaintiff-Appellee,

v

STEVEN DEEHL,

        Defendant-Appellant,

and

ALEX DEEHL,

        Defendant.

UNPUBLISHED
May 30, 2024

No. 363678
Shiawassee Circuit Court
LC No. 20-004798-CH

Before: MARKEY, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Defendant, Steven Deehl (Steven), appeals by right a bench-trial judgment finding him vicariously liable for unlawful ejectment and trespass in relation to acts committed by his son and codefendant, Alex Deehl (Alex). The facts underlying this lawsuit stem from Steven's purchase of a home owned by plaintiff, ML, at a foreclosure sale and Alex's occupation of the property before the end of the redemption period. Steven contends that the trial court erred by finding that Alex was his agent for purposes of Alex's occupation of the premises and by miscalculating damages. We conclude that the record evidence supports the trial court's judgment. Accordingly, we affirm.

## I. BACKGROUND

In December 2019, police arrested ML for committing a murder inside his home in Morrice, Michigan. The mortgagee foreclosed on the house, and Steven purchased the home at the foreclosure sale on February 26, 2020. Because Steven was unable to personally attend the sale, Alex placed the winning bid on the property on his father's behalf. ML's brother, Paul Latunski, was named as his conservator on the day of the foreclosure sale. Generally, a defaulted

property owner has six months to redeem the property after a foreclosure sale. See MCL 600.3240(8). Steven claimed that the property was "abandoned," shortening the redemption period to 30 days. See MCL 600.3240(9); MCL 600.3241a. Steven posted a notice of abandonment on the property. The trial court concluded that the claim of abandonment was false because conservator's counsel had sent correspondence to Steven beforehand indicating that the conservator intended to redeem the property and directing Steven to "stay off" the premises. Alex moved into the home on March 28, 2020, and immediately began removing personal property from the house and preparing the residence for renovations.[1] From March 5, 2020, through June 8, 2020, Steven avoided the conservator's attempts to redeem the property, forcing the conservator to deposit the redemption funds with the register of deeds. Steven waited until August 27, 2020, to collect the redemption funds at the register of deeds office and record the certificate of redemption.

Plaintiff commenced summary proceedings in the district court and secured a possession judgment that resulted in Alex's eviction from the home. The conservator was finally able to make entry into the house on September 3, 2020, finding the residence in severe disrepair and damaged. He also discovered that numerous items of personal property were missing. Plaintiff filed the instant trespass and ejectment action against Steven and Alex to recover damages for physical harm to the real property and the loss of personal property, all of which allegedly occurred during Alex's occupation of the home. In an amended complaint, plaintiff alleged that Alex was Steven's agent during the time that Alex occupied the residence, making Steven vicariously liable for Alex's torts and the damages he caused.

Alex did not timely respond to plaintiff's amended complaint and motion for summary disposition. The trial court thus defaulted Alex on the issue of liability, permitting him to defend only with respect to damages. The court held a three-day bench trial at which Steven and Alex argued that plaintiff exaggerated the alleged damages to the property and sought recovery for losses caused by others before the foreclosure sale even took place. The court found that Alex was Steven's agent and held Steven vicariously liable for Alex's actions. The court calculated plaintiff's actual damages and awarded treble damages under the unlawful ejectment statute, MCL 600.2918. Ultimately, the trial court held Steven liable in the amount of $906,933, and it held Alex liable for $948,137.84. The court made defendants jointly and severally liable for the smaller judgment amount. Steven now appeals.

---

[1] On March 28, 2020, the conservator and Alex confronted each other at the house regarding legal entitlement to possession of the premises. There was evidence that the conservator had been at the home on March 27, 2020, and found that the locks had been changed. The police responded to the altercation on March 28, but could not discern which party owned the property. At that time, the police decided to allow Alex to remain in the home, and the conservator was ordered to leave.

## II. AGENCY

Steven contends that Alex was his agent for the limited purpose of bidding on the subject property. Steven thus argues that he could not be held liable for Alex's actions after the February 26, 2020 foreclosure sale because Alex acted without Steven's authority. We disagree.

"Any question relating to the existence and scope of an agency relationship is a question of fact." *Hertz Corp v Volvo Truck Corp*, 210 Mich App 243, 246; 533 NW2d 15 (1995). " 'This Court reviews a trial court's findings of fact following a bench trial for clear error and reviews de novo the trial court's conclusions of law.' " *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 279; 829 NW2d 345 (2013), quoting *Redmond v Van Buren Co*, 293 Mich App 344, 352; 819 NW2d 912 (2011). In a bench trial, the court must make factual findings in relation to whether the plaintiff proved the elements of his or her civil action, including damages, by a preponderance of the evidence. See *Jackson v Bulk AG Innovations, LLC*, 342 Mich App 19, 20; 993 NW2d 11 (2022).

> A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made. The trial court's findings are given great deference because it is in a better position to examine the facts. [*Chelsea Investment Group, LLC v City of Chelsea*, 288 Mich App 239, 251; 792 NW2d 781 (2010) (citations omitted).]

"This Court is especially deferential to the trial court's superior ability to judge . . . the relative credibility of witnesses." *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020) (quotation marks, citation, and brackets omitted).

"Generally, Michigan law will impose liability upon a defendant only for his or her own acts of negligence, not the tortious conduct of others." *Laster v Henry Ford Health Sys*, 316 Mich App 726, 734; 892 NW2d 442 (2016). A defendant, however, may be held vicariously liable for the tortious conduct of an agent:

> A principal may be vicariously liable to a third party for harms inflicted by his or her agent even though the principal did not participate by act or omission in the agent's tort. Vicarious liability is indirect responsibility imposed by operation of law. Courts impose indirect responsibility on the principal for his or her agent's torts as a matter of public policy, but the principal, having committed no tortious act, is not a "tortfeasor" as that term is commonly defined. Because liability is imputed by law, a plaintiff does not have to prove that the principal acted negligently. Rather, to succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently. Concomitantly, if the agent has not breached a duty owed to the third party, the principal cannot be held vicariously liable for the agent's actions or omissions. [*Bailey v Schaaf (On Remand)*, 304 Mich App 324, 347; 852 NW2d 180 (2014) (quotation marks and citations omitted), vacated in part on other grounds 497 Mich 927 (2014).]

The principal's vicarious liability for the agent's actions is justified by the principal's ability to control the agent. *Laster*, 316 Mich App at 735.

Under the common law of agency, in determining whether an agency has been created, we consider the relations of the parties as they in fact exist under their agreements or acts and note that in its broadest sense agency includes every relation in which one person acts for or represents another by his authority. Fundamental to the existence of an agency relationship is the right of the principal to control the conduct of the agent. [*Wigfall v Detroit*, 504 Mich 330, 340; 934 NW2d 760 (2019) (quotation marks and citations omitted).]

An agent's authority may be actual or apparent. *DBD Kazoo LLC v West Mich LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361299); slip op at 6. "Actual authority of an agent may be implied from the circumstances surrounding the transaction at issue. These circumstances must show that the principal actually intended the agent to possess the authority to enter into the transaction on behalf of the principal." *Id.*, quoting *Hertz Corp*, 210 Mich App at 246. Not all "actual" agency relationships are created by express agreement. " 'Implied authority is the authority which an agent believes he possesses.' " *DBD Kazoo*, ___ Mich App at ___; slip op at 6, quoting *Meretta v Peach*, 195 Mich App 695, 698; 491 NW2d 278 (1992).

An agent's actual authority may be express or implied. Implied authority consists of the power to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden. Implied authority must rest upon acts and conduct of the alleged agent known to and acquiesced in by the alleged principal prior to the incident at bar. Whether the act in question is within the authority granted depends upon the act's usual or necessary connection to accomplishing the purpose of the agency. [*Wigfall*, 504 Mich at 340-341 (quotation marks, citations, and brackets omitted).]

" 'An implied agency cannot exist contrary to the express intention of an alleged principal although it may spring from acts and circumstances permitted by the principal over a course of time through acquiescence.' " *DBD Kazoo*, ___ Mich App at ___; slip op at 6, quoting *Wigfall*, 504 Mich at 341-342. "When an agent purporting to act for his principal exceeds his actual or apparent authority, the act of the agent still may bind the principal if he ratifies it." *David v Serges*, 373 Mich 442, 443-444; 129 NW2d 882 (1964). "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Id.* at 444 (quotation marks and citation omitted).

It is undisputed that Steven expressly granted Alex the authority to bid on the home at the foreclosure sale. The trial court found incredible Steven's assertion that the agency relationship ended after the sale. This was a sound finding given Steven's conflicting testimony and claimed ignorance of basic information. Alex had actual authority, both express and implied, to live at the subject property and to renovate it.

Steven did more than simply ask Alex to attend the foreclosure sale on his behalf. Steven admitted that Alex brought the idea of purchasing the property to him. Steven and Alex both claimed that they did not discuss a spending cap before Alex attended the auction. This seems incredible as Steven was funding the project. Steven claimed that he and Alex did not discuss their plans for the property, but Steven also testified that he and Alex contemplated Alex's living at the

home while attending Michigan State University. Believing criminal charges against him were likely, Alex invoked his Fifth Amendment right against self-incrimination when asked at his deposition about his plans for the property.

> The privilege against self-incrimination not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also permits him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. However, the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the amendment does not preclude the inference where the privilege is claimed by a party to a civil cause. [*Phillips v Deihm*, 213 Mich App 389, 399-400; 541 NW2d 566 (1995) (citations omitted).]

Because Alex refused to answer, the trial court was free to infer that Alex intended to move into the property.

Between February 26, 2020, and March 28, 2020, Steven continued to act like he was investing in the property with Alex. He and Alex went together to walk the land and inspect the property. After consulting more than one attorney, Steven posted a notice of abandonment on the land and recorded the document with the register of deeds, attempting to reduce the redemption period from six months to 30 days. Steven did this even though the conservator's attorney notified him of the conservator's intent to redeem the property. Steven communicated this plan to Alex as evidenced by Alex's telling responding officers on March 28, 2020, that he waited until the end of the 30-day redemption period to move into the home. From this evidence, the trial court could reasonably infer a coordinated effort to retain ownership of the property despite the conservator's clearly conveyed intent to redeem. We also note that Alex initiated structural alterations or renovations to the home and cleared personal property from the residence. He did so notwithstanding this was a house purchased by his father and not Alex, which, in and of itself, necessarily suggested that Alex acted with actual authority, either express or implied, granted by Steven. A simple tenancy relationship would generally not allow for such actions. Moreover, there was no evidence that Steven purchased the house as a gift to Alex, leaving him free to do as he alone wished.

In a letter dated April 9, 2020, Steven informed the conservator's attorney that Alex was not his agent and that he directed Alex to leave the property. Steven refused to take any action to control Alex, and he instructed the conservator to file an eviction proceeding to secure Alex's removal. At the same time, Steven avoided redemption by failing to respond to attempts by his own attorney (Mark Hanna) to facilitate the transaction. Early in these proceedings, Steven admitted that Hanna was his attorney at that time. Steven later contended that he never retained Hanna and did not know why Hanna was acting on his behalf. The trial court could again reasonably infer a coordinated plan between Steven and Alex from these actions and the contradictory responses by Steven.

Steven claimed that the interaction between the conservator and Alex at the subject property on March 28, 2020, made Steven decide against having any further involvement in the

-5-

deal. Yet, Steven continued to visit the property. He falsely asserted that he was at the house only once. On further inquiry, Steven admitted to at least four visits. The court could reasonably infer that Steven had likely been on the land on other occasions.

A continued agency relationship could also be reasonably inferred from Alex's use of Steven's personal vehicles to assist in moving into and cleaning out the house. If Steven truly ordered Alex not to move into the house as he claimed, it is incredible that he would allow Alex free use of his vehicles to assist in the move and renovation. The presence on the property of vehicles owned by Steven's car dealership, Fenton Fine Used Autos, similarly supported the existence of a continuing agency relationship. Steven initially claimed that he allowed Alex to use these vehicles. But when the court and opposing counsel advised Steven that it is illegal for family members to use dealer plates, Steven suddenly asserted that Alex was an "agent" of the car dealership. By stating that Alex was an agent of Fenton Fine Used Autos, Steven likely unwittingly admitted to an ongoing business relationship with Alex. Alex also provided support for this ongoing agency relationship. Alex testified that he "regularly" attended automobile auctions for Steven, although he tried to take back that testimony. Even if Steven were not an agent of the dealership, the court could still infer that the presence of various dealership vehicles on the land was another sign of Steven's approval of Alex's continued presence. Steven posited that he brought the vehicles to the property for Alex and a friend to repair. If, however, Steven truly wanted no part of Alex's residency in the home, Steven would not have supported Alex's actions in working on dealership vehicles on the premises at issue.

Ultimately, this was a bench trial, and the trial court was in the best position to judge firsthand the credibility of the witnesses. Evidence was presented from which the trial court could find that Alex served as Steven's agent throughout his residency at the subject property. This Court may not interfere with the assessment by the trier of fact regarding the weight of the evidence and the credibility of the witnesses. See *Allard v State Farm Ins Co*, 271 Mich App 394, 408; 722 NW2d 268 (2006). We hold that the trial court did not clearly err by finding that Alex was Steven's agent at all relevant times. Because Alex was Steven's agent in possessing the property, Steven could be held vicariously liable for Alex's unlawful ejectment of plaintiff's conservator from the property and the unlawful trespass as well as for the monetary damages arising from those acts. We conclude that reversal on the issue of liability is unwarranted.

### III. DAMAGES

Steven also challenges the adequacy and accuracy of the trial court's calculation of damages. We review "the trial court's determination of damages following a bench trial for clear error." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 513; 667 NW2d 379 (2003).

In a tort action, the plaintiff has the burden of proving "actual damage with reasonable certainty." *4041-49 W Maple Condo Ass'n v Countrywide Home Loans, Inc*, 282 Mich App 452, 459-460; 768 NW2d 88 (2009). "Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96; 706 NW2d 843 (2005) (citations omitted).

In a bench trial, "the court shall find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment." MCR 2.517(A)(1). "Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without over elaboration of detail or particularization of facts." MCR 2.517(A)(2).

> Findings of fact regarding matters contested at a bench trial are sufficient if they are brief, definite, and pertinent, and it appears that the trial court was aware of the issues in the case and correctly applied the law, and where appellate review would not be facilitated by requiring further explanation. [*Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176-177; 530 NW2d 772 (1995) (quotation marks, citations, and brackets omitted).]

Steven's challenge concerning the adequacy of the trial court's findings on damages lacks merit. Steven suggests that the trial court was required to specifically address his challenges to various items in the conservator's lists of claimed damages. This is not required. In *Triple E Produce Corp*, *id.* at 177, this Court rejected a challenge to a damages award where the trial court "made no independent finding regarding damages but merely entered judgment for plaintiffs and awarded $40,000 in damages." This Court reasoned:

> Because we have concluded that the trial court was aware of the issues and correctly applied the law, and because the award was within the range of the evidence, we find no clear error in the award. Accordingly, remand is unnecessary because any further explanation by the trial court would not facilitate appellate review. [*Id.*]

In this case, the trial court acknowledged that Steven challenged the accuracy of the claimed damages, but it found the conservator more credible in this regard. The court also stated that it found the conservator "credible when he disputed estimates of the insurance company." The court later observed:

> As the Court already noted, it found [the conservator's] testimony generally credible. Even when [the conservator] disputed the figures of the insurance company, the Court found his testimony credible and supported by the evidence.

> To the extent damages are difficult to prove with mathematical certainty, that's a risk of the conduct of [Steven and Alex], so they should bear the risk of [plaintiff] receiving a windfall.

Though brief, these findings met the requirements of MCR 2.517(A)(2).

Turning to the substance of the damages award, we note that the element of damages in this case was complex because there were multiple actors involved. Before the conservator compiled his damages list in late February 2020, plaintiff was in the process of remodeling, and the house was in disarray. Plaintiff likely damaged the home's interior when he committed the murder inside. The police caused additional damage during their investigation of the crime scene. The conservator and plaintiff were estranged for many years, and the conservator did not know what condition the home was in before these events. The mortgage company altered the property by having a contractor remove a U-haul filled with "hazardous" materials in an effort to secure the

house, including the removal of oak trim from the windows to board them up. Looters and vandals invaded the property after it was made notorious. This all occurred before Alex moved into the home and was documented in an insurance claim the conservator filed on March 20, 2020. The insurance adjusters were unable to access the home to document the claimed damages because Alex had taken possession. While Alex and Steven cannot be held liable for any property damaged, disposed of, or stolen before March 28, 2020, they also cannot credibly challenge the extent of damages caused before their occupation because their presence and lack of cooperation prevented the insurance adjusters from verifying the claims.

Ultimately, a large portion of the trial transcripts is devoted to plaintiff's presenting evidence and testimony regarding damages to the home arising during Alex's residency between March 28, 2020, and September 3, 2020, and defendants' efforts to challenge those alleged damages. The conservator explained at length discrepancies, unclear descriptions, and potential duplication of items between the two damage reports.

The trial court, as the trier of fact, reviewed the conservator's lengthy testimony regarding actual damages. It reviewed the police reports, insurance claims, photographs, and the conservator's lists regarding damages. After carefully considering the extensive evidence, the court found the conservator more credible than Alex and Steven. The trial court did not go into great detail in calculating the damages award, but it was not required to do so. After reviewing the record, we found only minimal potential duplicated items, too inconsequential to be of any basis for reversal. In sum, on this record, we cannot conclude that the trial court committed clear error in relation to the award of damages.

## IV. CONCLUSION

We hold that the trial court did not err by finding that Alex was Steven's agent throughout his occupation of the subject property and by determining that Steven was vicariously liable for the damages Alex caused. Further, we hold that the trial court made adequate record findings of fact regarding the damages awarded and did not clearly err in calculating the award.

We affirm. Having fully prevailed on appeal, plaintiff may tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ Michael J. Riordan
/s/ Thomas C. Cameron