# STATE OF MICHIGAN

# COURT OF APPEALS

FMG II DEVELOPMENTS LLC,

Plaintiff/Counter-Defendant-
Appellee,

v

KRISTINE R. DEYO,

Defendant/Counter-Plaintiff-
Appellant.

UNPUBLISHED
November 24, 2015

No. 322943
Livingston Circuit Court
LC No. 14-027863-CK

Before: METER, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

In this breach of contract action, defendant/counter plaintiff Kristine R. Deyo appeals by right a July 7, 2014, judgment entered in favor of plaintiff/counter-defendant FMG II Developments, LLC (FMG) following a bench trial. For the reasons set forth in this opinion, we reverse and remand for further proceedings.

## I. BACKGROUND

In 2005, FMG sought to develop approximately 66 acres of former farmland in Milford Township owned by Kristine and her late husband Ken Deyo ("Deyo property"). Specifically, FMG planned to develop the Crossings of Milford, a residential site condominium that was to have 22 separate residential lots. To facilitate the land transaction, FMG entered into a five-year land contract with the Deyos on July 18, 2005. Under the terms of the land contract, FMG was required to pay the Deyos a principle of $1,202,580 with $300,645 down, with semi-annual 6-percent interest payments for the entire five-year term.

In addition, before the Deyos conveyed deeds for any of the individual lots, FMG agreed to improve the site by constructing roads and utilities and installing storm sewers. FMG was also responsible for paying the property taxes on all of the lots (a combined total of nearly $40,000 per year); FMG agreed to insure the property and pay any assessments. Following the initial prep-work, on FMG's request, the Deyos agreed to release warranty deeds for individual lots upon FMG's payment of approximately $64,423.93 per lot (i.e. $1/14^{th}$ of the beginning principle balance on the land contract, hereinafter "release price"). Following the release of a lot, FMG would convey the lot to a purchaser who would in turn obtain a construction loan and hire a builder to construct a residential home. The release payments were to be deducted from

-1-

the principle balance due and the Deyos were required to pay the transfer taxes on each conveyance. The principle balance was due July 18, 2010 (five years after the contract was executed) and "[t]he final deed in fulfillment of the land contract shall be described as that portion which has not been previously released and consideration shall be the original selling price less the consideration on any previously released Units [i.e. lots]."

Paul Elkow testified that, originally, FMG had four corporate members, but at the time of trial, he was the only remaining member. Elkow testified that, at about the same time that FMG signed the land contract with the Deyos, FMG also entered into a contract with a neighboring landowner Elkow referred to as "Mr. Schimmel." Schimmel owned property that abutted lots 3 through 8 on the Deyo property and FMG agreed to pay Schimmel $25,000 per lot to merge the properties into the site condominium.

By March 3, 2006, FMG was able to start marketing lots for sale following the initial infrastructure work. FMG paid the full release price for Lot 3 and Lot 7, one of which was used to construct a model home. However, FMG was unable to generate further sales. Elkow explained that the real estate market "turned on a dime," and from 2006 to 2010 FMG was unable to generate interest in the development. According to Elkow, FMG made four semi-annual interest payments to the Deyos, but stopped paying interest on July 20, 2007. Elkow testified that, sometime around the time he stopped paying interest, he discussed the market conditions with Ken, a long-time acquaintance. Elkow explained to Ken that he was "not able to generate anything" and he gave Ken the following three options: (1) Elkow could return the entire parcel of land to Ken, (2) Elkow and Ken could negotiate the release price of the lots to market value, or (3) Elkow would do the best he could to repay every dime of the principle, but if Ken demanded the interest payments, Ken would have to take the property back. Elkow could not recall when he spoke with Ken about modifying the land contract and he did not have anything in writing to show that the parties modified the contract, but Elkow stated that he had multiple conversations with Ken about the market and the development.

Elkow testified that at the time he approached Ken he could not continue to make the interest payments on top of the $40,000 per year in property taxes FMG was paying for the lots. Elkow explained that property values in the area dropped by at least 40-percent and there were other lots that he could purchase at a far lower price such that it made no sense to keep making the interest payments to the Deyos for a project with no profit potential. Elkow explained that if Ken had not agreed to waive the interest payments, he would have walked away from the Crossings of Milford project leaving the Deyos to pay the property taxes on the unsold lots. According to Elkow, when he gave Ken the three options to modify the contract, Ken responded by stating that Elkow needed to find a way to keep the property taxes paid.

At trial, Elkow testified that in consideration for Ken's concessions on the interest payments, Elkow agreed to keep paying the property taxes and to aggressively market the lots. In addition, according to Elkow, Ken was concerned that if Elkow walked away from the project, the Deyos would be stuck with the Schimmel land contract and the remaining $75,000 to release Schimmel's lots. Elkow agreed that the Deyos were not a party to the Schimmel contract and that only FMG owed Schimmel duties under the contract. Nevertheless, according to Elkow, as part of the consideration for the Deyos waiving the interest payments, Elkow arranged a

transaction to pay off Schimmel thereby relieving Ken of any future liabilities if FMG walked away from the Crossings of Milford project.

Sometime after speaking with Elkow about market conditions, Ken drafted two letters dated December 14, 2007, and April 5, 2009, and sent them to Elkow regarding the land contract. The trial court admitted the letters into evidence. The December 2007 letter read as follows:

Dear Paul:

Per our telephone conversation on Monday, December 10, 2007, we discussed options that would help alleviate the financial burden of both the interest payment of $23,192.55 due on [January 15, 2008] to me and property taxes due February [2008].

I have agreed to defer the January 15, 200[8] interest payment of $23,192.55. This interest payment must be paid up between January 15, 2007 and July 15, 2010. This continues the balance of our land contract as of January 15, 200[8] in the amount of $773,085.07. The land contract will continue as normal with the next interest payment due July 15, 200[8].

Kristine testified that when she typed the letter she mistakenly used the year 2007 in place of 2008 for some of the dates. Elkow testified that the letter contradicted what Ken had said during their conversations.

The April 5, 2009, letter read as follows:

During an informal meeting on April 3, 2009 between Paul Elkow and me, Paul requested a reconsideration of the land contract, due to the depressed building industry and the failing economy. We discussed several different possibilities to help stimulate sales at the Crossings of Milford. As noted to Paul, I have not seen any signs or advertising that indicate this particular piece of property has lots for sale. As I desire to help and have already helped in this economic hardship. Paul and I have come to the following understanding on "*four (4) lots only*." This understanding does not in any way change the land contract terms or conditions. "*Only the payoff of four (4) lots*."

The following understanding pertains to the payoff of *four (4) lots only* . . . this understanding does not change any part of the land contract or any clause therein and interest will continue to be added to the land contract:

That the lots involved will be of mutual agreement before building processes will begin, and these *four (4) lots* only will be considered to be of a less desirable nature. Consideration will be given as to there [sic] location, size, topography and any other factor necessary to determine there [sic] individual value.

> I will agree to accept payment of $51,539.14 for each of the **four *(4) lots only***. Deed will then be granted for each of these **four *(4) lots only***. This reflects a discount on each of the *four (4) lots only*.
>
> Interest will continue to be applied to the land contract balance in the normal manner set forth in the land contract before and after such payment on each of the ***four (4 lots) only***. **It shall be noted that interest payments are expected as to the terms of the land contract and an _attempt_ should be made to make these payments in a timely manner**.

Elkow agreed that Ken sent this letter to him, but he stated that he did not accept its terms.

After Ken drafted the second letter in April 2009, from 2009-2013, the Deyos released 16 of the remaining 20 lots to FMG for a price lower than the original release-price of about $64,000. At trial, plaintiff introduced all 16 deeds for these releases. Kristine did not dispute that she and Ken signed the deeds and released the lots to FMG for less than $64,000. In addition, contrary to the terms of the land contract, the Deyos did not pay the transfer taxes for any of these 16 lots. Kristine testified that she did not recall paying any transfer taxes and Elkow testified that FMG paid the transfer taxes. Furthermore, although the land contract was to terminate on July 18, 2010, the parties continued to release lots under the terms of the contract after 2010 and the Deyos did not send a notice of default or foreclosure to FMG. At the time of Ken's death in February 2012, the land contract remained in effect in that the Deyos had not released all of the lots and FMG had not requested a payoff amount.

To recap, by December 2013 the Deyos had released 18 of the 22 lots to FMG, 16 of which were released for less than $64,000. In December 2013, Kristine continued to hold the remaining lots. It appears that in December 2013, Elkow requested that Kristine release the final four lots by requesting a payoff amount on the land contract. According to Elkow, Kristine refused to release the lots or provide a payoff amount and she did not respond to his inquiries.

When Kristine refused to release the final four lots, FMG commenced this lawsuit alleging breach of contract. FMG alleged that the Deyos agreed to modify the land contract to eliminate the 6-percent semi-annual interest payments, that FMG had paid the Deyos an aggregate amount of $1,120.494.90 for release of the 18 lots and for the down payment, that there was a total of $82,085.10 remaining on the principle balance of the land contract, and that payment of the $82,085.10 was all that was required to compel Kristine to release the final four lots. FMG alleged that, despite its offer to pay the $82,085.10, Kristine refused to release the final four lots in breach of the land contract. FMG requested monetary damages and an order requiring Kristine to convey fee simple title of the final four lots to FMG.

The trial court held a one-day bench trial on June 25, 2014. In addition to Elkow's testimony discussed above, FMG offered the testimony of Paul Harmon, a real estate broker, and Patrick Hanniford, a Certified Public Accountant (CPA). Harmon testified that he prepared the deeds for the 18 lots that the Deyos released. He was familiar with the Crossings of Milford project and he was aware that FMG made some interest payments in accord with the terms of the land contract. However, Harmon was not aware of any interest that FMG paid during the

transfer of the final 15 deeds and he was not aware of any modifications to the Deyo's responsibility for paying the transfer taxes.

Hanniford testified that as of August 25, 2014, the balance due on the land contract was $73,872.89. Hanniford arrived at this figure after reviewing FMG's payment history less the transfer taxes that the Deyos were required to pay and he calculated the amount on the assumption that interest ceased as of January 2, 2007. Hanniford explained that he did not calculate interest because that was FMG's theory of the case

Kristine testified at trial and her testimony showed that Ken was more involved with the land contract than she was. Kristine testified that Elkow called Ken in December 2007 and indicated that he could not afford to pay property taxes and the interest payments. Kristine explained that she knew about the subject of the telephone call because Ken told her about it. Kristine testified that she discussed with Ken the subject of helping Elkow through tough times, but never discussed reducing the interest payments to zero. Kristine explained that after Ken died in February 2012, Elkow told her to retain a lawyer because they needed to renegotiate the terms of the land contract. However, according to Kristine, Elkow never informed her that he thought the interest was at zero.

Kristine introduced a hand-written ledger that Ken used to keep track of payments received, interest and balance due on the land contract. The ledger indicated that, even after FMG's July 2007, semi-annual interest payment—which FMG alleged was its final interest payment before the Deyos agreed to waive the interest—Ken continued to add accrued interest to the balance due. Ken continued to add accrued interest to the principle balance through July 15, 2010, which is about the time the land contract was originally set to expire. In addition, Ken recorded two unidentified payments received in July 2008 and July 2009 in the amounts of $8,000 and $4,000 respectively. These payments are not identified as interest and they were not for the release of any lots. Elkow testified that he was "being kind," when he made the two payments, but he denied that the payments were interest payments.

Dennis Siegner, a CPA, testified on behalf of Kristine. Siegner testified that Ken was a client for over 20 years and Siegner prepared the Deyo's annual tax statements through 2011. Siegner was familiar with the payments made under the land contract. Siegner explained that he recorded as interest some of the money FMG paid for the release of the lots. Siegner explained that because Ken recorded payments for the release of the lots as "credits," some of that amount could represent interest. Siegner testified that as of August 2013, the total outstanding balance on the land contract was $329,165.72. This figure was prepared under the assumption that the Deyos did not waive the 6-percent interest payments.

Following arguments, the trial court entered an oral opinion into the record finding in favor of FMG in pertinent part as follows:

> I just wanted to confirm that everybody agrees the burden of proof is preponderance of the evidence . . . not clear and convincing. . . .

* * *

I agree with defendant that the down turn in the economy was an event, not consideration. I also agree that if the only fact was there was no notice of default, notice of forfeiture, forfeiture or foreclosing proceedings, I could not find that the land contract was modified, more particularly that interest was waived. However, the crash of the housing market was an event that led the parties to agree that it was necessary to modify the land contract. Otherwise, as so many developers were doing, the defendant would have been left holding the land with taxes of approximately $40,000.00 and no one to sell it to. There was a meeting of the minds in 2007. It's not like . . . there was some acquiescence by slice. That wouldn't suffice. There was consideration. If the plaintiff had walked away from the development, both – actually Schimmel's probably would have suffered; Deyo would have suffered; and maybe they could have worked together. As I said before, that's speculative. There would have been a cloud on the taxes. Deyo apparently was not in the position where he thought he had all the necessary money. He didn't want to pay the real estate taxes. He didn't want to be left in that kind of position. This wasn't a favor to Deyo as defendant professes that, of paying off Schimmel. This is where Mr. Deyo had to work as part of their agreement to make sure that Schimmel got paid off. The conveyance of the deeds, uh, numerous after interest stopped in '07 and conveyance of deeds as late as August of 2013 is one fact that establishes that there was a meeting of the minds.

I find for the plaintiff. Defendant must execute warranty deeds conveying units 18, 19, 20 and 21 to plaintiff in exchange for the sum of $73,872.89 and the seller is to pay the transfer tax. I am not convinced that the transfer taxes paid to date by the plaintiff was anything other than part of this agreement, part of this meeting of the minds that this is what everyone had to do to save themselves.

The trial court entered a written order reflecting its holding on July 10, 2014, and dismissing Kristine's counter-claim. Kristine filed a claim of appeal by right on July 30, 2014. Subsequently, on August 4, 2014, Kristine moved the trial court to stay proceedings, and proposed to place executed deeds to the four remaining lots in escrow pending appeal. At a hearing, the trial court ordered the deeds held in escrow, ordered that an injunctive order be recorded against the properties, and ordered Kristine to pay a $500,000 bond. Kristine then moved this Court to amend the order with respect to the bond and this Court granted the motion and amended the order to eliminate the bond, finding that it was excessive and unnecessary. *FMG II Developments LLC v Deyo*, unpublished order of the Court of Appeals, entered August 22, 2014 (Docket No. 322943).

## II. ANALYSIS

On appeal, Kristine argues that the trial court erred in finding that there was mutual assent to modify the land contract and waive interest.

We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Chelsea Inv Grp LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). Whether the evidence supports that the parties modified a contract involves a

-6-

question of fact that we review for clear error. *HJ Tucker & Associates v Allied Chucker & Eng Co*, 234 Mich App 550, 563; 595 NW2d 176 (1999). However, to the extent that we must interpret the land contract and determine whether the statute of frauds renders an alleged modification unenforceable, these issues involve questions of law that we review de novo. *Chelsea*, 288 Mich App at 250; *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 458; 733 NW2d 766 (2006).

"While the freedom to contract principle is served by requiring courts to enforce unambiguous contracts according to their terms, the freedom to contract also permits parties to enter into new contracts or modify their existing agreements." *Quality Products & Concepts Co. v Nagel Precision, Inc.*, 469 Mich 362, 370-371; 666 NW2d 251 (2003). This holds true whether the original contract is oral or written, *Nelson v Witte*, 347 Mich 411, 415; 79 NW2d 906 (1956), and a contract can be modified notwithstanding anti-waiver clauses or restrictive-amendment provisions. *Quality Products*, 469 Mich at 364. However, a party may not unilaterally alter an original contract, "[r]ather, a party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract." *Id*. at 372. "This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract." *Id*. at 364-365.

Although a party can generally prove modification through evidence of an oral agreement or course of conduct, in cases involving the sale of real property, "[o]rdinarily, a subsequent modification of a contract for the sale of land must be in writing to be legally enforceable." *Windorf v Ferris*, 154 Mich App 201, 203; 397 NW2d 268 (1986); see also *Reid v Bradstreet Co*, 256 Mich 282, 286; 239 NW 509 (1931) (noting that "[i]t is well established that a written contract may be varied by a subsequent parol agreement unless forbidden by the statute of frauds. . . .") This is because Michigan's statute of frauds provides in relevant part that:

> Every contract for the leasing for a longer period than 1 year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing: [] [MCL 566.108.]

Moreover, MCL 566.1 provides as follows:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration: Provided, *That the agreement changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest shall not be valid or binding unless it shall be in writing* and signed by the party against whom it is sought to enforce the change, modification, or discharge. [Emphasis added.]

In this case, the trial court erred as a matter of law in finding that there was consideration to support the alleged modification of the land contract to eliminate interest. Here, FMG alleged

that there was consideration to support the modification because it did not walk away from the project and because it paid-off the Schimmel contract. In essence, FMG alleged that, because it did not breach its contracts with Schimmel and the Deyos, the Deyos received consideration for agreeing to waive the interest payments. The trial court essentially agreed with FMG, reasoning that FMG continued to pay the property taxes and paid-off the Schimmel contract, which in turn, provided the Deyos with a benefit. This amounted to an error of law. FMG was already required to pay the property taxes and perform all of its other duties under the terms of the land contract and Elkow agreed that only FMG had duties under the Schimmel contract. The Deyos were not required to waive interest to compel FMG to perform its duties under these agreements as it is a long-standing principle of contract law that "doing what one is legally bound to do is not a consideration for a new promise." *Puett v Walker*, 332 Mich 117, 122; 50 NW2d 740 (1952) (quotation marks and citations omitted). Accordingly, because there was no new consideration for the alleged modification, FMG was required to prove by clear and convincing evidence that the alleged modification was in writing and signed by the Deyos. MCL 566.1.

Before analyzing whether there was a written modification, we note that the trial court erred as a matter of law when it held that plaintiff had the burden to prove modification by a preponderance of the evidence. As noted above, a party alleging modification has the burden to prove modification by clear and convincing evidence. *Quality Products*, 469 Mich at 364-365. FMG claims that appellant waived this issue by agreeing with the trial court that FMG had to prove its case by a preponderance of the evidence.

Ordinarily, "[a] party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Grant v AAA Michigan/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006). Notwithstanding appellate counsel's legal error in the lower court, we will address whether FMG proved by clear and convincing evidence mutual assent to modify the contract because this is the proper legal standard, the application of which is necessary to a proper determination of the case. See *Klooster v City of Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011). Moreover, as discussed below, irrespective of which burden is applied, the court clearly erred as a matter of law in determining that there was a modification regarding interest that conformed to the statute of frauds.

A review of the record indicates that, clearly, the parties agreed to some amendments to the land contract. Evidence showed that Elkow and Ken engaged in several discussions regarding the tough economic climate. Sometime thereafter, the Deyos released warranty deeds to 16 of the remaining 20 lots for less than the originally-agreed upon amount of approximately $64,000. The deeds showed that there was mutual asset to modify the release-price of the individual lots, but, contrary to the trial court's finding and FMG's argument on appeal, the deeds do not amount to writings that evinced mutual assent to waive the interest payments. FMG cannot identify any language within the deeds relative to a modification of the interest payments. Nor were there any written documents attached to the deeds that shed any light on whether the parties agreed to modify the interest payments.

Moreover, contrary to the trial court's findings, other evidence introduced at trial supported that there was no mutual assent to waive the interest payments. Specifically, the two letters that Ken sent to Elkow shortly after their discussions about the market conditions supported that the Deyos did not agree to waive the interest payments. The trial court found that

these letters were "difficult for me to work through," and stated, "suffice it to say that, uh, they're unclear." To the contrary, the language in the letters clearly indicated that Ken agreed to reduce the release price of some of the lots and agreed to delay some of the interest payments, but nothing in the letters supported that he agreed to waive the interest payments in their entirety or reduce the interest rate to zero.

For example, in the December 2007 letter, Ken stated that he agreed to defer the January 15, 2008, interest payment, but he also noted that "[t]he land contract will continue as normal." Similarly, in the April 2009 letter, while Ken discussed reducing the release price for certain lots, he explicitly stated, "[t]his understanding does not in any way change the land contract terms or conditions," and "this understanding does not change any part of the land contract or any clause therein and interest will continue to be added to the land contract. . . ." Near the end of the letter, Ken repeated, "[i]nterest will continue to be applied to the land contract balance in the normal manner set forth in the land contract . . ." and in bold text stated, "**interest payments are expected as to the terms of the land contract and an _attempt_ should be made to make these payments in a timely manner**" (emphasis in original). Thus, on no less than three occasions in the same letter, Ken indicated that interest would continue to accrue per the terms of the land contract. This language does not support that there was mutual assent to waive interest in its entirety. While Ken may have evinced a willingness to afford extra time to make the payments, he repeatedly stated that the interest would continue per the original agreement.

In addition, when the letters are considered in conjunction with other written evidence and Kristine's testimony, we are left with a definite and firm conviction that the trial court erred in finding that the parties modified the land contract and that the court erred as a matter of law in concluding that such modification complied with the statute of frauds. As noted above, other than the deeds which did not reference interest, FMG did not introduce any writing to support that the parties modified the land contract with respect to interest. Indeed, the only other documentary evidence at trial supported that the Deyos did not waive interest. Of particular note, Ken's hand-written ledger showed that the Deyos did not assent to waiving the interest payments. The ledger showed that even after FMG's alleged final interest payment in July 2007, Ken continued to add six percent interest to the total amount due on the land contract. The ledger showed that Ken kept a rolling tally of the total amount due on the land contract and every six months, Ken made an entry for unpaid interest.

Specifically, Ken made entries on the ledger on January 15, 2008, 2009, and 2010 and July 15, 2008, 2009, and 2010. These entries were entitled "INTEREST" and added to the total balance due and the timing of the entries dovetailed with the terms (i.e. semi-annual payments) and the duration (i.e. July 2010) of the land contract. Ken's final entry was recorded on a date that coincided with the time that the land contract was set to terminate—July 18, 2010. Following that entry, Elkow agreed that Ken mailed a copy of the ledger to him in November 2010, evincing Ken's intent that Elkow pay the interest as required under the land contract. The ledger supports that there was no meeting of the minds regarding a waiver of the interest payments. Rather, the ledger constitutes clear evidence that Ken expected the interest to be paid upon expiration of the land contract.

Furthermore, evidence of the parties' course of conduct and oral statements does not support that there was mutual assent to waive interest. At best, Elkow's testimony showed that

Ken stated that Elkow needed to find a way to keep the property taxes paid. Elkow did not testify that Ken explicitly stated that he would waive the interest payments. Rather, Ken's letters and ledger supported that there was no mutual assent regarding the interest and evidence that Elkow made a $4,000 and $8,000 payment to Ken sometime after the discussions supported that he was aware that interest was due.

In short, the trial court clearly erred in finding that there was mutual assent to modify the land contract to waive interest and erred as a matter of law in holding that the modification complied with the statute of frauds.[1] Remand is therefore appropriate for a determination of a final amount due on the land contract taking into account the contract's interest provisions. The court should take note that the interest payments ceased as of July 2010, per the terms of the land contract and the parties did not enter into a written agreement to extend the interest payments beyond that point. Additionally, because Kristine has failed to identify any evidence of a written modification regarding the Deyos' duty to pay the transfer taxes for the final 16 lots, that amount should be subtracted from the final amount due on the land contract.

Reversed and remanded for further proceedings consistent with this opinion. Neither party having prevailed in full, neither may tax costs. MCR 7.219(A). Jurisdiction is not retained.

/s/ Patrick M. Meter
/s/ Stephen L. Borrello
/s/ Jane M. Beckering

---

[1] Given our resolution of this issue, we need not address appellant's argument concerning the admissibility of Ken's and Schimmel's out of court statements.

-10-