# STATE OF MICHIGAN

# COURT OF APPEALS

---

LOREN E PITSCH JR. , and GARY L PITSCH

        Plaintiffs-Appellants,

v

PITSCH HOLDING COMPANY, INC., STEVEN
B PITSCH, LAURA M PITSCH and LEWIS D
PITSCH

        Defendants-Appellees.

UNPUBLISHED
November 29, 2018

No. 340402
Kent Circuit Court
LC No. 07-004719-CR

---

LOREN E PITSCH JR. , and GARY L PITSCH

        Plaintiffs-Appellees,

v

PITSCH HOLDING COMPANY, INC., STEVEN
B PITSCH, LAURA M PITSCH and LEWIS D
PITSCH

        Defendants-Appellants.

No. 340494
Kent Circuit Court
LC No. 07-004719-CR

---

Before: MURPHY, C.J., and O'CONNELL and BECKERING, JJ.

PER CURIAM.

These consolidated[1] appeals arise out of a long and bitter dispute over control of a family owned closely held corporation. The parties are five siblings who are shareholders of defendant Pitsch Holding Company, Inc. ("PHC" or "the company"). Both sides in this dispute appeal as of right from a September 18, 2017 final order. In Docket No. 340402, plaintiffs Loren Pitsch,

---

[1] *Loren E. Pitsch Jr v Pitsch Holding Co, Inc*, unpublished order of the Court of Appeals, entered October 11, 2017 (Docket Nos. 340402, 34094).

-1-

Jr., and Gary Pitsch challenge the trial court's rulings that they did not reach a settlement agreement in December 2006 to sell their stock to defendants and that they were not oppressed minority shareholders. In Docket No. 340494, defendants PHC, Steven Pitsch, Laura Pitsch, and Lewis Pitsch challenge the trial court's ruling that Laura Pitsch did not hold voting preferred stock in PHC, and its order that PHC pay plaintiffs' attorney fees during the course of this litigation. In their respective appeals, both sides challenge the trial court's ruling that PHC may seek reimbursement or use as a setoff some, but not all, of the payments PHC made to or on behalf of plaintiffs over the course of this litigation. Likewise, both parties argue that the trial court did not properly resolve their company's deadlock. We affirm the trial court's rulings, but remand the matter to the trial court so that the court may order dissolution of the company.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

In 1958, Loren Pitsch, Sr.,[2] started a demolition business that grew into the array of corporate entities at the heart of this case. In 1974, plaintiff Gary Pitsch joined the business on a full-time basis, followed soon after by Lewis Pitsch. Loren Pitsch, Sr., reduced his role in the business in the mid-1980s, and by 1986, the business had been reorganized into a collection of corporate entities. From 1986 until the formation of PHC in 1993, Gary served as president of the various corporate entities. In 1993, the parties signed a subscription agreement and a shareholder agreement, both prepared by attorneys at the law firm representing Pitsch businesses. In relevant part, the subscription agreement gave each Pitsch parent and child shares of non-voting common stock in PHC, and the right to purchase 10 shares of voting preferred stock for $100 ($10 per share). The subscription agreement deemed Gary, Lewis, and Loren Pitsch to have exercised their right, and gave the other Pitsch siblings until December 31, 1997, to exercise theirs. The shareholder agreement addressed the terms and conditions for stock transfers, sales, or purchases.

The family amended the shareholder agreement on January 30, 1996 to acknowledge that the parties' sister, Kathleen Pitsch, whom the subscription agreement indicated had opted out of PHC, had sold her remaining shares in PHC, and that Steven Pitsch was working fulltime for PHC and was expected to exercise his subscription rights. Steven did indeed exercise his subscription right on May 1, 1996. At this point, the siblings who held voting preferred stock in PHC were Gary, Lewis, Loren, Steven, and Dale Pitsch. Kathleen had opted out of the business from the beginning, as already indicated, and Gloria Pitsch and defendant Laura Pitsch had not expressed their intent regarding exercise of their subscription rights. In 1997, Gloria disclaimed any interest in exercising her right to subscribe to voting preferred stock,[3] leaving only Laura Pitsch to express her intentions before the December 31, 1997 deadline.

---

[2] Loren E. Pitsch, Sr., died in 2003. Unless otherwise indicated, as used in this opinion, "Loren" refers to Loren Pitsch, Jr.

[3] Gloria expressed her intent sometime around the death of Dale Pitsch in an airplane crash in July 1997. Subsequently, the company purchased the common stock in PHC owned by Gloria and formerly owned by Dale in accordance with the terms set forth in the shareholder agreement.

Steven and Laura testified at one of the bench trials held in this matter that after Dales' death but before December 31, 1997, Laura, who was working in Sault Ste. Marie for Pitsch Land Development,[4] decided to exercise her right to purchase voting preferred stock. She told Steven to deduct the $100.00 from her paycheck, Steven relayed the information to David Cole, the company controller, and Cole so instructed the bookkeeper. It is undisputed that there is no evidence the company took that deduction. Likewise, it is undisputed that at all times relevant to this appeal, there is no evidence that the company issued Laura a certificate for voting preferred stock or registered her in the company's stock register as holding voting preferred stock. Dale's death left Gary, Lewis, Loren, and Steven in charge of the company, and they occasionally called upon Laura to cast the tiebreaking vote when they could not agree. Laura moved back to Grand Rapids from Sault Ste. Marie in 2000, after which she was elected a member and officer of the board of directors and took an active role in corporate governance. In 2002, she cast the deciding vote to replace Gary as president of PHC with Steven, and in 2006, she voted with Steven and Lewis to terminate the employment of Gary and, eventually, Loren.

Steven and Gary tried unsuccessfully to work out the terms pursuant to which PHC would buy Gary's and Loren's stock in the company. Gary, Loren, and Steven would later testify that the primary sticking point was defendants' insistence that Gary and Loren release their rights prior to an appraisal of the company. Steven testified that he wanted such release in the event Gary and Loren did not like the appraisal and decided not to sell. Unable to get defendants to authorize an appraisal of the business without the release, Gary and Loren hired a firm in the summer of 2006 to conduct an appraisal. The firm valued the business at $10 million dollars, which defendants thought grossly inflated.[5]

In an attempt to move things forward, Gary called a shareholders meeting for December 7, 2006, and asked all the shareholders to bring copies of their stock certificates By this time, his research had indicated to him that Laura had never been issued a certificate for voting preferred stock. Gary's suspicions were confirmed when all the siblings except Laura produced their stock certificates. After the shareholders meeting, the company's attorney submitted a proposed

---

[4] Pitsch Land Development, Inc., is not one of the Pitsch entities that comprise PHC.

[5] Another sticking point between the parties has been the price of plaintiffs' stock. Defendants have consistently offered plaintiffs $1.1 million for their stock. Plaintiffs have just as consistently insisted that the price should be determined according the provisions set forth in § 5 of the shareholder agreement. Section 5(a)(i) states that purchase price of stock sold under the shareholder agreement shall be determined annually. Section 5(a)(ii) provides that if no value has been agreed upon for a period of two years and a purchase price must be determined, the price

> "shall be the net fair market value of the Company and its subsidiaries, regardless of any prior accounting treatment, of the assets or property of the Company and its subsidiaries, as determined by the independent certified public accounts at that time retained by the Company for its annual preparation of financial statements and/or tax returns . . . ."

settlement agreement to plaintiffs. Plaintiffs re-drafted the proposal and sent it back. The company rejected the re-draft, indicating in a letter to Loren Pitsch's attorney that it seemed counterproductive to revise the already re-drafted proposal and sent it back to plaintiffs "because we seem so far apart on the fundamentals."

On February 2, 2007, the same date that the company rejected plaintiffs' revised settlement agreement, the parties signed a "Cash Advance Agreement" (CAA), which provided in relevant part that:

> Commencing with execution of this Agreement, the Company will pay $1,400 per week to Gary Pitsch and $1,050 per week to Loren Pitsch, Jr. as advances against the Purchase Price of the Selling Shareholders' non-voting common stock in the Company if and when the Selling Shareholders sell such stock to the Company. At closing, the amount of the advances will be credited on the Company's purchase price of such stock. If such an agreement is not reached by [April 1],[6] 2007, such payments will cease and if no other obligations are determined to be owed to the Selling Shareholder, each Selling Shareholder will repay such advances made to that Selling Shareholder to the Company with interest at 5% per annum from the date of each advance payable upon demand by the Company or resolution of the claims by a court of competent jurisdiction.

Unable to reach an agreement to sell their stock to the company, plaintiffs filed a seven-count complaint on May 7, 2007. Plaintiffs asked the court to find a deadlock (Count II), shareholder oppression (Count IV), and that the parties had reached a settlement agreement in December 2006 (Count VII).[7] Along with their complaint, plaintiffs also filed a motion for a temporary restraining order (TRO), seeking continuation of the company's weekly payments to them under the terms of the CAA and of the company's payment of their health insurance premiums. They also asked the court to prevent defendants from disposing of the company's assets outside of the ordinary course of business and to prevent the company from indemnifying the individual defendants or retaining legal counsel on their behalf.

Unavailable for the hearing on plaintiffs' motion for a TRO, defendants' attorney reached an agreement with plaintiffs' attorneys. According to the May 17, 2007 letter memorializing the agreement, plaintiffs agreed to adjourn the motion hearing in exchange for defendants' continuing to make the cash advance payments to plaintiffs and the payments on plaintiffs' health insurance premiums. Plaintiffs would still be required to reimburse the Company "and/or these monies will be used as a setoff against any subsequent buyout terms as set forth in the

---

[6] Originally, the deadline for the agreement was March 1; but, a line is drawn through "March 1" and "April 1" is handwritten in the margin.

[7] After a 14-day bench trial, the trial court found that plaintiff had failed to establish its claims for fraud and mismanagement (Count I), improper wage withholding (Count III), and indemnification of defendants (Count V), and for removal of the individual defendants from their positions (Count VI). Plaintiffs do not appeal the trial court's rulings on these counts.

CAA." In addition, defendants agreed not to declare "any bonuses, sell any equipment (other than in the ordinary course of business), increase their pay or declare any dividends," or issue any new stock, pending a hearing on plaintiffs' motion. Defendants further agreed "not to do anything 'extraordinary' that is not in the keeping of the ordinary course of the Company's business until [plaintiffs'] Motion is heard." Defendants' attorney understood that plaintiffs would re-notice the motion "for some time in the next 2-6 weeks." It is undisputed that plaintiffs never re-noticed this hearing, and that PHC continued to make the cash advance payments and to pay plaintiffs' health insurance premiums.

In 2009, the trial court held a bench trial over seven days on Count II (deadlock) of plaintiffs' complaint. At issue was whether Laura had held the voting preferred stock authorizing her to vote on matters of corporate governance. The trial court heard testimony regarding Laura's involvement in various Pitsch entities since the 1980s, her contributions to PHC, and that no one had questioned her status as a holder of voting preferred stock before the December 2006 shareholder meeting called by Gary. However, defendants presented no documentary evidence of Laura having paid the requisite $100 for voting preferred stock or of certificates for the stock, and no corporate documents, including tax returns, indicating that she was a holder of voting preferred stock. Based on the testimony and evidence presented at trial, the court found as a matter of fact that "Laura Pitsch did not take the steps necessary prior to December 31, 1997, to acquire voting preferred stock." The court also rejected defendants' estoppel-based argument that, because Laura had voted in the past, she should be allowed to continue to do so. The trial court's ruling created a 2-to-2 deadlock among the voting shareholders and directors of PHC.

Although the court instructed the litigants to present proposals to break the deadlock, the dispute dragged on. At a February 5, 2010 hearing on multiple motions, the trial court ruled that PHC would continue to pay Gary and Loren's "salaries" and provide them with insurance. Soon, both sides sought clarification of the trial court's use of the word "salaries," and the trial held a hearing in June to clarify its February order. After oral argument, the trial court acknowledged that it had not previously understood that plaintiffs were not receiving a salary, but an amount of money equal to their net salary that they were obligated to pay back under the terms of the CAA, and admitted that its use of the word "salary" had complicated matters. The court saw three options going forward. It could continue the payments under the CAA, a solution that plaintiffs did not want, it could call the payments "salary," which did not work because that carried future problems in its wake, or it could consider the money "consulting fees" or "dividends." As the court saw it, the problem with calling the payments "dividends" was that if PHC declared dividends for one shareholder it had to declare them for all shareholders. Thus, the court determined, and plaintiffs agreed, that the simplest solution was to view the payments as "consulting fees" for which plaintiffs would receive 1099s and be responsible "for both sides of FICA taxes and everything else on it."[8]

_____

[8] In a later order, the trial court aptly wrote, "Implementation of the consulting-fee arrangement proved to be a disaster." The company filed a motion in November 2010 to enforce the agreement by asking the court for permission to instruct Gary and Loren to perform services in

The bench trial on the remaining counts in plaintiffs' complaint began on February 18, 2015.[9] The testimony relevant to the present appeal concerned whether the parties had reached an enforceable agreement in December 2006 and whether defendants had engaged in shareholder oppression. Mid-trial, after hearing testimony on the parties' efforts to reach an agreement in 2006 and reviewing the draft proposals and letters exchanged by the parties' attorneys, the trial court involuntarily dismissed plaintiffs' claim that the parties had reached an enforceable settlement in 2006.

With regard to shareholder oppression, plaintiffs testified that defendants failed to hold shareholder meetings, excluded plaintiffs from bonuses and contributions to their 401K accounts, denied them sufficient access to the company's books and records, and intentionally demeaned them. It was undisputed that there had been only two board meetings during the course of this dispute, both called by Gary, and that it became clear at the second meeting that the parties could not agree on anything. Regarding bonuses and distributions, both sides indicated that only employees received bonuses and contributions to their 401k accounts. Both Gary and Steven testified that the company had never given a bonus to someone simply because he or she was a shareholder or member of the board of directors. When it came to access to the office and to the company's books and records, Gary and Loren testified that defendants had not made it easy for them to obtain the information they wanted. Gary recounted that when he went to PHC's office, Steven would sometimes follow him around, asking questions and video recording him, and that defendants made it difficult for him to work in his office by replacing his office chair with a broken one, using his office for storage, removing his telephone, and taking the blinds from his window. Both Gary and Loren testified that they thought the work Steven assigned to them under the consulting-fee arrangement was intentionally demeaning.

The bench trial concluded on August 12, 2015, and the trial court issued its opinion and order on May 31, 2016. With regard to plaintiffs' shareholder oppression claim, the trial court first found that the shareholder oppression statute, MCL 450.1489, created a statutory cause of action for minority shareholders abused by controlling persons, but due to the 2-to-2 deadlock, plaintiffs were not minority shareholders. The court further observed that even if plaintiffs could claim oppression as minority shareholders, even after their terminations they were "treated virtually the same as the other shareholders of Pitsch Holding." Specifically, defendants provided them "substantial access" to the company's books and records, the value of their shares increased, and plaintiffs' termination did not adversely interfere with their distributions "because the company does not make—and has never made—distributions to its shareholders in the

---

exchange for their consulting fees. Subsequent to a hearing, the court granted the motion, ordering plaintiffs to report to work pursuant to the schedule and terms set forth by Steven. Almost immediately, conflicts erupted on the company's property as plaintiffs accused Steven of mistreating them in work assignments, while Steven accused plaintiffs of insubordination. Before long, the trial court concluded that the arrangement was too explosive to sustain, and excused Gary and Loren from the obligation to work for PHC.

[9] Lewis declared bankruptcy in 2010, which delayed proceedings in this case for three years. That event, as well as several other issues, extended the life of this litigation to over ten years.

routine course of its business operations." In sum, the court observed, "with the exception of PHC's failure to regularly hold meetings of its shareholders and its board of directors, the current management team has taken no actions that have disadvantaged Gary and Loren Pitsch in their capacity of shareholder." Accordingly, the trial court found no basis to impose liability on defendants or award damages to plaintiffs on their claim of shareholder oppression.

After the second bench trial, defendants sought to stop making weekly payments to plaintiffs, to stop paying plaintiffs' attorney fees, and to be allowed to give themselves six years' worth of cost of living raises.[10] At an August 5, 2016 hearing on the motion, the court granted defendants' request to give themselves raises and to stop paying plaintiffs' attorney fees. However, the court ordered that defendants continue the weekly payments to plaintiffs, with the understanding that all payments going forward were "cash advances, not salary, not consulting fees, not anything else[,]" and that plaintiffs would have to repay "or account for" every dollar that comes out of the company as cash advances.

The last main issues to be addressed were how to resolve the deadlock and how to treat the weekly payments that PHC had made to plaintiffs for nearly a decade. At a November 7, 2016 hearing on these issues, plaintiffs informed the trial court that they had recently (less than two weeks prior) placed their shares in trust in accordance with certain provisions of the shareholder agreement, and asserted that this transfer of their shares dictated resolution of the deadlock. They believed that transfer of the shares into trust triggered other provisions of the shareholder agreement that, eventually, would fix the purchase price of plaintiffs' stock as "the net fair market value of the Company and its subsidiaries[,]" as required by § 5(a)(ii) of the shareholder agreement (see note 5 above). With regard to the weekly payments, the parties' arguments are essentially the same as those raised on appeal and addressed elsewhere in this opinion.

The trial court rendered its opinion on the deadlock and cash advance issues in a July 5, 2017 opinion and order. The court rejected the dissolution as a means of resolving the deadlock. Noting that dissolution is a " 'very drastic remedy' " that requires proof of " 'exceptional circumstances before dissolution will be ordered,' " the trial court concluded that the steady success of the company under Steven's leadership did not present circumstances necessitating dissolution. Regarding plaintiffs' suggestion that it appoint a disinterested director to cast the tiebreaking vote, the court stated that nothing in the Michigan Business Corporation Act (BCA) gave it the authority to do so.

The trial court's solution was to encourage the parties to adopt the process set forth in the January 18, 1993 Shareholder Agreement, to which all of the individual litigants were signatories. Sections 2.1, 2.2, and 2.5 of the agreement set forth procedures to follow when a

---

[10] Plaintiffs alleged in various ways that defendants were enriching themselves at the expense of the company and the other shareholders and directors (i.e., plaintiffs). Nevertheless, the evidence adduced at the second bench trial left the trial court with the "unshakable view that the defendants – and particularly Steven Pitsch – have been good stewards of the family business . . . ."

shareholder wishes to sell or transfer some or all of his or her stock. Section 2.1 gives the company a 30-day option to purchase some or all of the shares of which the seller has made a bona fide offer of sale or transfer. If the company does not exercise its option, § 2.2 gives non-selling shareholders the option to purchase some or all of the seller's shares. If neither the company nor the non-selling shareholders purchase the shares on offer, § 2.5 gives the selling/transferring shareholder 60 days to sell or transfer the shares to the person or entity identified in the written notice required by § 2.3 at the price, and under the terms and conditions specified in the notice.[11] The trial court surmised that either plaintiff could trigger this process by making an offer to sell his shares to the other plaintiff. The court observed that, although the shareholder agreement provides a means of resolving the dispute, the court could not compel the parties to engage in the process.

Turning next to the question of how to treat the weekly payments defendants had been making to plaintiffs for nearly a decade, the trial court elected to enforce the unambiguous language of the parties' February 2, 2007 CAA and May 17, 2007 letter extending payments under the terms of that agreement. The CAA characterized the payments Gary and Loren received as "advances against the Purchase Price" of their stock, and plainly obligated them to repay the advance to PHC with interest at 5% per annum. Likewise, the letter of May 17, 2007 obligated PHC to continue paying Gary and Loren's wages and health insurance premiums under the same terms set forth in the CAA, which meant in relevant part that Gary and Loren had to repay or use as setoffs the amounts they received subsequent to the May 17, 2007 letter. According to the court, however, the obligation of Gary and Loren to repay the advances ended with the February 5, 2010 order characterizing the payments going forward as "consulting fees." Thus, the court concluded that PHC could seek repayment from Gary and Loren (with interest) of the advances paid out before February 5, 2010, and after August 5, 2016, but not the monies paid out under the consulting-fee arrangement. Further, because the CAA did not address the payment of health insurance premiums, PHC could not seek repayment from Gary and Loren for insurance coverage provided during the course of this litigation.

## II. ANALYSIS

## A. STANDARD OF REVIEW

We review a trial court's findings of fact in a bench trial for clear error. *Chelsea Inv Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Id*. at 251. We give great deference to the trial

---

[11] Section 2.3 requires the selling/transferring shareholder to

> give Company and the other Shareholders written notice of any such sale or transfer ("Notice"). The Notice shall include a description of the Shares which the Shareholder proposes to sell or transfer ("BFP Shares"), the name of the person or entity to which the transfer is proposed, the consideration to be received, and the other terms and conditions of the proposed transfer.

court's findings because the trial court is in a better position to examine the facts. *Id*. We review de novo a trial court's conclusions of law. *Id.*

## B. DOCKET NO. 340402

### 1. BINDING SETTLEMENT AGREEMENT

Plaintiffs first argue that the trial court erred by dismissing their claim that the parties reached a binding agreement in December 2006 *requiring* defendants to purchase plaintiffs' shares in the company in accordance with the terms set forth in the 1993 Shareholder Agreement. We disagree.

The interpretation of a settlement agreement is "governed by the legal principles applicable to the construction and interpretation of contracts." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452–53; 733 NW2d 766 (2006). "Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed." *Id*. at 452-453 (quotation marks and citations omitted). "Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Id*. at 453. "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*. at 454 (quotation marks and citation omitted).

Struggle for control of the company is central to this litigation and permeated the parties' negotiations. Defendants insisted that the parties sign and deliver a mutual release contemporaneous with the execution of any settlement agreement, but both plaintiffs testified that this requirement was the "sticking point" that prevented the parties from reaching an agreement in 2006. Even Loren's attorney admitted that the provision was important to the parties at the time. Defendants attached to their proposed settlement a " 'Unanimous Consent Resolutions of Shareholders and Directors' . . . to be executed and delivered contemporaneous with the execution of th[e] Settlement Agreement." Under the terms of the Consent Resolutions, all of the board members, including Gary Pitsch and Loren Pitsch, were to resign effective immediately, and the successor board was to be comprised of Steven Pitsch, Lewis Pitsch, and Laura Pitsch. Contrariwise, plaintiffs' draft agreement provides for each of the selling shareholders to "remain as a Director until the debt owed to them by the company is paid in full." Further, defendants' agreement permits the sellers to "be entitled to full access of the Company's books should the Company fall into arrears on the payment obligations of the Selling Shareholders for a period in excess of one quarter." However, plaintiffs' draft agreement provides that under the same circumstances, the sellers will "be entitled to access *and control* of the Company's books *and operations*." These demonstrated differences between the parties on the essential issue of control militate against a conclusion that the parties reached an enforceable agreement.

Plaintiffs contend that the company attorney's statement in a February 2, 2007 letter, regarding a "meeting of the minds" that plaintiffs' stock would be purchased pursuant to the terms of the 1993 shareholder agreement, constitutes an acknowledgement that the parties reached a binding agreement. Actually, what the company's attorney did in the letter was contrast its understanding of what the parties had agreed to at the December 2006 meeting with

-9-

how Loren Pitsch's attorney represented that agreement in his re-drafted proposed settlement agreement. The import of the letter is to express that whatever defendants thought they had agreed to, the proposed settlement agreement redrafted by Loren Pitsch's attorney proves that they were not on the same page. The testimony of plaintiffs, the observation of plaintiffs' attorney, comparison of the competing draft agreements, and the fact no signed settlement agreement exists are "express words and visible acts" indicating that there was no meeting of the minds with regard to the purchase of plaintiffs' stock. See *Kloian*, 273 Mich App at 454. Thus, we decline to conclude that the trial court erred in dismissing Count VII, plaintiffs' claim that the parties had reached a binding settlement agreement in December 2006.

## 2. SHAREHOLDER OPPRESSION

Plaintiffs contend that the trial court erred in finding that they did not have standing to bring a claim of shareholder oppression under MCL 450.1489, and that defendants' actions did not constitute shareholder oppression. We disagree.

MCL 450.1489(1) provides that any shareholder of a corporation may bring a cause of action "to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder." "Willfully unfair and oppressive conduct" means

> a continuing course of conduct or a significant action or series of actions that subsequently interferes with the interests of the shareholder as a shareholder. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder. The term does not include conduct or actions that are permitted by an agreement, the articles of incorporation, the bylaws, or a consistently applied written corporate policy or procedure. [MCL 450.1489(3).]

Plaintiffs predicated their shareholder oppression claim on a determination that Laura Pitsch held voting preferred stock. According to their own conditions, plaintiffs' shareholder oppression claim vanished with the trial court's ruling following the 2009 bench trial that Laura did not have voting rights because she had not complied with the steps necessary to obtain such rights. See *Estes v Idea Engineering & Fabrications, Inc*, 250 Mich App 270, 278; 649 NW2d 84 (2002) (interpreting MCL 450.1489 to provide a "cause of action for 'oppression' in favor of minority shareholders who are abused by 'controlling' persons"). Moreover, even if plaintiffs could assert a claim for shareholder oppression, the alleged acts of defendants did not constitute "a significant action or series of actions that subsequently interferes with the interests of the shareholder *as a shareholder*." MCL 450.1489(3).

The Michigan Supreme Court has recognized the contractual nature of the relationship between a corporation and its shareholders and has looked to a corporation's articles of incorporation, bylaws, and governing statutes to determine a shareholder's interests. *Madugula v Taub*, 496 Mich 685, 718; 853 NW2d 75 (2014). In addition, the BCA defines "shareholder" as " 'a person that holds units of proprietary interest in a corporation . . . .'" *Id*. quoting MCL 450.1109(2). Among the rights shareholders in a corporation have are "the right to vote, inspect

-10-

the books, and receive distributions." *Madugula*, 496 Mich at 718. Shareholders may also enter into shareholder agreements, the corporation's breach of which may be evidence of shareholder oppression. *Id*. at 718-719. However, as this Court has held, MCL 450.1489 "does not allow shareholders to recover for harm suffered in their capacity as employees or board members." *Franchino v Franchino*, 263 Mich App 172, 178; 687 NW2d 620 (2004) (concluding that termination from employment and removal from the corporation's board of directors did not constitute oppression under MCL 450.1489).

Plaintiffs contend in their brief to this Court that they "undeniably have been fired from their positions with Defendant Pitsch Holding Company, Inc., are receiving no income from a profitable company in which they have a 40% combined ownership interest and are basically excluded from all aspects of corporate management, despite being members of the Board of Directors . . . ." They further contend that "a myriad of lesser slights," including video recording them when they are on company property and threatening their arrest if they attend company parties, constitute interference with their interests as shareholders."

Plaintiffs' termination from employment with the corporation does not necessarily constitute shareholder oppression. See *Franchino*, 263 Mich App at 178. It might be evidence of oppression if it violates the Shareholder Agreement, see *Madugula*, 496 Mich at 719, but it does not. Paragraph 6.2 of the Shareholder Agreement states that it is "not a contract of employment between [PHC] and any Shareholder," and does "not grant any Shareholder any rights to continue in the employment of the Company, or limit the Company's right to terminate a shareholder's employment." Termination of their employment was an action plaintiffs suffered as employees, not as shareholders, and it did not violate the Shareholder Agreement. Therefore, it is not evidence of shareholder oppression under MCL 450.1489(3). The same is true of plaintiffs' claim of oppression based on defendants' prohibiting them from attending employee Christmas parties.[12]

Plaintiffs' claim that they receive no income from a profitable company in which they have a 40% combined ownership interest is not entirely true. To the extent that they are referring to receiving no bonuses or distributions of any kind, the record evidence clearly shows that these are perquisites reserved for employees, and plaintiffs ceased to be employees in 2006.[13] Record testimony established that the company has never paid dividends, has always tied distributions to employment, and has never paid shareholders and directors simply for being shareholders and directors. This does not mean that plaintiffs have not received any income or benefits from PHC since their termination. It is undisputed that since 2007, the company has paid plaintiffs a weekly sum equivalent to their net pay, paid their health insurance premiums, allowed them to

---

[12] Likewise, while following plaintiffs with video recording equipment may be offensive, such behavior cannot reasonably be said to "interfere with the interests of the shareholder as a shareholder." MCL 450.1489(3).

[13] It is worth noting that after defendants received bonuses in 2007 and 2008, they were under court order not to distribute bonuses or give themselves raises until the court lifted the order in August 2016.

keep and use company vehicles, and allowed Gary Pitsch to keep and use his company-owned laptop computer. Although the company may seek reimbursement of some of the money paid to plaintiffs during the course of this litigation, the company may not seek reimbursement of plaintiffs' health insurance premiums and it has not sought reimbursement for plaintiffs' use of its vehicles and computer. As the trial court pointed out, "even after their termination, Plaintiffs Gary and Loren have been treated virtually the same as the other shareholders of Pitsch Holding."

Regarding plaintiffs' exclusion from corporate management, evidence at trial established that the company's board members, i.e., the litigants, had been unable to function as a board since 2006. First, they disagreed as to who could vote on matters of corporate governance, and then the trial court's decision after the first trial resulted in an even split among the voting members. Gary called board meetings in 2006 and 2010,[14] but both he and Steven admitted that they accomplished nothing. Any board member could have called a special board meeting, but apart from Gary, none did because of their demonstrated futility. The deadlock prevented all of the directors, not just Gary and Loren, from functioning and cooperating as directors.

Given the facts in this case, and considering the company's past practices and the provisions of its shareholder agreement, one cannot reasonably say that plaintiffs are oppressed minority shareholders.

## C. DOCKET NO. 340494

### 1. STATUS OF LAURA PITSCH

Defendants first contend that, because Laura Pitsch took all the steps necessary to become a voting shareholder of the company and trusted the company to deduct the money for the voting shares from her paycheck, the trial court clearly erred by finding that she was not a voting shareholder. We disagree.

It is undisputed that there is no record evidence that Laura paid $100.00 for ten shares of voting preferred stock; there is no paper trail, no stock certificate, and no corporate record to show that she exercised her subscription right. See MCL 450.1331 ("the shares of a corporation shall be represented by certificates . . . .").[15] Defendants point to a number of other things that Laura and other siblings did and thought as evidence that she was a voting shareholder, but they cite no authority that would have allowed the trial court essentially to rewrite the subscription

---

[14] According to Article 1, § 1.3 of the company's bylaws, any board member "with an aggregate of ten percent (10%) of the outstanding shares of stock of [PHC] entitled to vote at the meeting" could have called a special board meeting.

[15] An exception exists where a corporation's articles of incorporation or bylaws provide, or its board authorizes, the issuance of some or all of its shares of stock without certificates. MCL 450.1336(1). Since the record establishes that PHC issued stock certificates to its voting preferred stock holders, we can assume that this exception is inapplicable.

agreement to deem actions other than payment of $100.00 sufficient consideration for the voting preferred shares.

Defendants contend that even if Laura did not pay the required $100.00 for voting preferred stock, the individual plaintiffs and the company should be estopped from denying her voting-share status, and that her integral involvement in the company since the 1980s should be deemed consideration for voting shares. Defendants rely for authority on *Heisler v Gingras*, 90 NY2d 682; 687 NE2d 1342 (1997), wherein two attorneys sued to enforce their status as shareholders in the law firm that employed them.[16] The court in *Heisler* affirmed the trial court's finding that one of the plaintiffs was a shareholder. Relying on the defendant law firm's bylaws and § 504(a) of New York Business Corporation Law, the *Heisler* court determined that a number of factors constituted consideration for the plaintiff's voting stock in the law firm and confirmation that he was a shareholder. These included the circumstances surrounding the law firm's employment of him, his exercise of managerial responsibilities at the firm, a memorandum from the firm's president to all firm employees announcing that he "was joining the firm as a managing shareholder," and his regular participation in and voting at shareholder meetings. *Id*. at 687-688.

Defendants assert that Laura's integral involvement in the company likewise provided consideration for her voting shares. She worked for Pitsch companies since the early 1980s, was one of the founders of two of the three original constituent companies of Pitsch Holding Company, attended shareholders' meetings in person or telephonically, became more involved in company business after she returned to Grand Rapids in 2000, and was elected a member of the board of directors.

Defendants' argument is unpersuasive. As already indicated, the court in *Heisler* reached its conclusion by relying on the defendant law firm's bylaws and a New York law, Business Corporation Law § 504(a),[17] that provided authority for the court to consider the prevailing plaintiff's history and status with the firm as consideration for his shares. Defendants cite to no similar authority in the subscription agreement, the company's bylaws, or Michigan law. Further, even if they had provided this Court with authority similar to New York's Business Corporation Law § 504(a), Laura's history with PHC differs substantially from the history of the prevailing plaintiff in *Heisler* with his law firm. Nothing in the record indicates that Laura worked for PHC prior to her return to Grand Rapids in 2000. Although she worked for various Pitsch entities in the 1980s and was a founder of two of the constituent entities of PHC, from

---

[16] "Cases from foreign jurisdictions are not binding, but can be persuasive." *Holton v Ward*, 303 Mich App 718, 727 n 11; 847 NW2d 1 (2014), citing *People v Campbell*, 289 Mich App 533, 5335; 798 NW2d 514 (2010).

[17] The law firm's bylaws provided that "[n]o certificate representing shares shall be issued until the full amount of consideration therefore has been paid, except as otherwise permitted by law." *Heisler*, 90 NY2d at 687. Business Corporation Law § 504 states that " '[c]onsideration for the issue of shares shall consist of money or other property, tangible or intangible, or labor or services actually received by or performed for the corporation or for its benefit.' "

1990 until her return to Grand Rapids in 2000, she worked for Pitsch Land Development, Inc., which was not part of PHC. In addition, her participation in shareholders meetings appears to have been more sporadic than regular, as is suggested by the testimony from both Steven and Laura that Laura's advice was sought after Dale's death only when a tiebreaking vote was necessary. Further, unlike for the prevailing plaintiff in *Heisler*, there are no corporate documents identifying Laura as a voting shareholder.[18]

Review of the record provides evidentiary support for the trial court's findings of fact and does not leave this Court with a definite and firm conviction that the trial court erred. *Chelsea Inv Group LLC*, 288 Mich App at 250. The court's conclusion comports with the documented facts, the requirements of the subscription agreement, and MCL 450.1331, and defendants have provided this Court with no authority to reverse the trial court's ruling.[19]

## 2. ATTORNEY FEES

Defendants contend that the trial court had no legal basis for ordering PHC to pay plaintiffs' attorney fees. Plaintiffs point out that they are still directors of PHC and contend that the trial court's order is supported by the BCA, which authorizes indemnification of a director who is party to an action, and the bylaws of PHC, which require indemnification fully as permitted by law. We conclude that defendants waived this issue by agreeing with the trial court's ruling requiring PHC to pay the attorney fees of all the parties. The express approval of the trial court's action extinguishes any claim of error with regard to that action; accordingly, there is nothing to review. See *Hodge v Parks*, 303 Mich App 552, 557; 844 NW2d 189 (2014).

The trial court issued the ruling at issue after a February 5, 2010 hearing on multiple motions. The trial court ruled that plaintiffs would have an office on PHC's premises and the right to be present on the premises, and would be paid their "salaries and provided insurance." Further, PHC would not dissipate assets and would make its financial records available to all preferred voting shareholders upon request. In addition, the management team of Steven Pitsch, Lewis Pitsch, and Laura Pitsch would stay in place. Defendants, through their attorney, agreed to all of this. The court then turned to its final ruling:

---

[18] Defendants contend that the trial court erred by relying on PHC's clearly erroneous tax returns as evidence that Laura was not a voting shareholder. This Court reviews a trial court's finding of fact under the clearly erroneous standard, and it must give regard to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. MCR 2.613(C). Even if the tax returns are replete with errors, the conclusion that the trial court draws from them regarding Laura's status as a shareholder is supported by the fact that certifications exist for the other siblings' voting stock but not one indicating that Laura had voting stock. The trial court did not commit clear error in its findings.

[19] Defendants also argue that promissory estoppel should apply. *Heisler* does not help them here, as the *Heisler* court expressly rejected estoppel as applicable in determining controversies of this kind.

THE COURT: The company—this is the one you may disagree with—the company shall pay all attorney fees for all parties involved in this litigation prospectively. In other words, I want to create a financial disincentive for this litigation to drag on endlessly. What it means is that the company pays both sides' attorney fees from this moment forward.

MR. BOSCH [Defendants' attorney]: Your Honor, I don't oppose that, provided it's subject to review of the Court.

THE COURT: Reasonable attorney fees.

MR. BOSCH: And reasonable.

THE COURT: We'll say reasonable attorney fees. In other words, this is not an authorization for either side to go out and bill a million dollars in the next two months.

MR. STARIHA [Gary Pitsch's attorney]: Your Honor, I'll take whatever Mr. Bosch gets paid.

THE COURT: All right. What I'm trying to do with that order is I want to try to create a financial incentive on everybody's part to try to bring this to some sort of resolution.

MR. BOSCH: Your Honor, those are fine. I can say nothing further than two points, and there's any number of things on the points the Court has already mentioned, but my clients are agreeing with those.

As the foregoing quotation from the February 5, 2010 transcript indicates, defendants agreed that defendant-PHC would pay the attorney fees of all parties in this litigation going forward. It is well established that "[a] party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Living Alternatives for Developmentally Disabled Inc v Dep't of Mental Health*, 207 Mich App 482, 484; 525 NW2d 466 (1994). Further, "[a] party may not claim as error on appeal an issue that the party deemed proper in the trial court because doing so would permit the party to harbor error as an appellate parachute." *Hoffenblum v Hoffenblum*, 308 Mich App 102, 117; 863 NW2d 352, 360 (2014) (citation omitted). Because defendants expressly did not oppose the trial court's decision to order PHC to pay all of the parties' attorney fees, it cannot now claim that the trial court erred in so doing.

D. COMMON ISSUES

1. REIMBURSEMENT OR SETOFF

As previously indicated, the trial court ruled that plaintiffs do not have to reimburse or use as a setoff the premiums PHC paid for their health insurance, or the monies received as "consulting fees" between February 5, 2010 and August 5, 2016. However, PHC may seek repayment under the terms of the cash advance agreement monies paid to plaintiffs before

February 5, 2010 and after August 5, 2016. Both sides challenge this ruling. We find no error. We review de novo a trial court's decision whether to grant equitable relief, *Walker v Farmers Ins. Exchange*, 226 Mich App 75, 79; 572 NW2d 17 (1997), and for clear error findings of fact supporting a trial court's equitable decision, *Webb v Smith*, 224 Mich App 203, 210; 568 NW2d 378 (1997).

As an initial matter, the trial court correctly observed that the CAA does not address PHC's payment of plaintiffs' health insurance premiums. The CAA obligates plaintiffs to repay or use as a setoff against the company's purchase of their stock only the weekly payments, and Steven testified as president of PHC that he was not seeking recoupment of the amount PHC paid for plaintiffs' health insurance premiums. As previously indicated, "[a] party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Living Alternatives for Developmentally Disabled Inc*, 207 Mich App at 484. We conclude accordingly that the trial court did not err by concluding that PHC cannot seek reimbursement from plaintiffs for the health insurance premiums PHC paid on their behalf.

Defendants contend that the CAA provides the only legal authority for the weekly payments made by PHC to plaintiffs during the course of this litigation and, therefore, that all of the payments are subject to repayment or set off according to the terms of that agreement. However, the record establishes that the trial court's 2010 designation of the payments PHC was to continue to make to Gary and Loren as "consulting fees," while perhaps initially the product of confusion, ultimately arose out of the trial court's concerns about the financial situation of the litigants and the problems created by calling the payments "salary." The trial court's characterization also arose in the context of plaintiffs' pending claims of fraud and mismanagement, and a claim of shareholder oppression brought pursuant to MCL 450.1489.[20] Claims under MCL 450.1489 are heard by a court of equity. *Madugula v Taub*, 496 Mich at 689. " '[T]he sound discretion of the court is the controlling guide of judicial action in every phase of a suit in equity.' " *Van Etten v Manufacturers Nat'l Bank of Detroit*, 119 Mich App 277, 286; 326 NW2d 479 (1982), quoting *Youngs v West*, 317 Mich 538, 545; 27 NW2d 88 (1947).

From our review of the record, we conclude that there is sufficient evidence to support the trial court's equitable decision to continue defendants' payments to plaintiffs under the paradigm of "consulting fee" rather than as payments under the CAA. Subsequent to a bench trial in 2009, the trial court determined that Laura did not hold voting preferred stock and was ineligible to vote on matters of corporate governance. Yet she voted along with Steven and Lewis to remove Gary as president of PHC in 2002 and terminate his employment with the company in 2006; without her vote, there would have been no majority to accomplish such outcomes. The latter decision set in motion the events leading to this litigation.

Further, once PHC terminated plaintiffs, they had no means of receiving compensation for work they did for any of the other Pitsch entities. Gary's testimony in particular suggests that

---

[20] The 2010 decisions at issue also occurred before Lewis filed for bankruptcy and at a time when the trial court still thought the parties could resolve their stalemate expeditiously.

he continued to work on Pitsch projects after his termination, and to go into the company's office a couple of hours a week. Further, once terminated, plaintiffs lost access to the other benefits of ownership that PHC reserved for owner/employees, such as the personal use of equipment, labor, and items taken from the salvage store. Moreover, at the time of the trial court's "consulting fee" decision, it was not clear that the individual defendants' payment of $600,000 in bonuses to themselves ($100,000 each in 2007 and 2008) was entirely above board. Once plaintiffs were unable to establish their claims of fraud and mismanagement at the second bench trial, the trial court put PHC's payments to defendants back under the paradigm of the CAA.

Defendants correctly state that the court's equitable power does not give it a license to engage in wholesale policymaking. *Devillers v Auto Club Ins. Ass'n*, 473 Mich 562, 590; 702 NW2d 539 (2005). In the present case, however, it appears to us that the trial court was responding to the unique and unusual circumstances of the seemingly interminable struggle for control of a family owned closely held corporation. It is a general rule of equity that each suit should be considered and decided on its own distinctive facts. *Van Avery v Seiter*, 383 Mich 486, 487-488; 175 NW2d 744 (1970). In sum, we cannot say that the record does not support the trial court's equitable decision. See *Webb*, 224 Mich App at 210.

Plaintiffs also challenge the trial court's ruling with respect to the payments they received from PHC. They contend that defendants are not entitled to reimbursement of any of the cash advance payments because defendants committed the first breach of the parties' May 17, 2007 agreement when, subsequent to and in violation of the agreement, they gave Laura Pitsch a substantial raise and declared hefty bonuses in 2007 and 2008. We disagree. Defendants' counsel assured plaintiffs that defendants would not increase their own pay or declare bonuses "pending a hearing on your Motion[,]" and twice stated his understanding that the motion would be re-noticed for some time in the next two to six weeks, i.e., before the end of July 2007. When that period passed without plaintiffs having rescheduled their motion, the promises expired. Accordingly, defendants were free to declare bonuses or pay increases consistent with the ordinary course of the company's business.

Plaintiffs next argue that neither the CAA nor the May 17, 2007 agreement bind them to repay the weekly cash advances. They contend that the CAA does not bind them because they executed it in contemplation of an impending settlement agreement that defendants claim never materialized, and that the May 17, 2007 letter does not bind them because it was not "executed by the parties with the same formality as [the CAA]." We find neither argument persuasive. Regarding the former, even if plaintiffs had entered into the CAA in anticipation of an imminent settlement, the CAA did not guarantee such settlement. Further, it was clear by the time they filed their complaint and their motion to continue to receive cash payments and have their insurance premiums paid, and agreed to the terms expressed in the May 17, 2007 letter, that settlement was not imminent. Regarding plaintiffs' latter argument, there is no record evidence that anyone objected to the form of the May 17, 2007 letter, and the fact that plaintiffs continued for years to accept payments provides clear and convincing evidence that they waived any

infirmities in the form of the letter.[21]   See *Kloian*, 273 Mich App at 454-455 (noting that affirmative conduct establishes mutual consent to modify the terms of the original contract).

Lastly, plaintiffs argue that both Gary Pitsch and Loren Pitsch performed services for related Pitsch companies after their termination, and that if they repay the cash advances, they will have worked for ten years without compensation.  In light of our decision that the trial court did not err in ruling that PHC could not seek reimbursement of the six-years of payments made under the "consulting fee" paradigm, we find it unnecessary to address this argument.

Unambiguous contract provisions are reflective of the parties' intent and will be construed and enforced as written.  *Coates v Bastian Bros, Inc*., 276 Mich App 498, 503; 741 NW2d 539 (2007).  No one argues that the terms of the CAA or the May 17, 2007 letter memorializing the parties' agreement are ambiguous.  Therefore, the trial court did not err in enforcing the terms of the CAA by ruling that defendants could seek repayment of the sums paid prior to February 5, 2010 and after August 5, 2016.

## 2. DEADLOCK

Finally, both sides argue that the trial court did not properly resolve their deadlock, and each side advances their own suggestion regarding how the deadlock should be resolved.  We agree that the trial court did not resolve the deadlock.  The court instructed the parties to comply with certain terms set forth in the 1993 shareholder agreement, but acknowledged that it could not force the parties to engage in the process.[22]  By doing this, the trial court essentially left the parties where they have been for the past decade: fully aware of the shareholder agreement, but each side unwilling to follow its procedures to settle their dispute unless the other side agrees to additional, objectionable provisions.

At one time or another during the course of this litigation, both sides have asked the trial court to dissolve the company.  When plaintiffs filed their complaint in 2007, they asked the court to "appoint a temporary receiver to manage the company until the deadlock could be

---

[21] Gary Pitsch contends that he was not party to the May 17, 2007 letter.  However, defendants' attorney sent a copy of the letter to Gary's attorney, noted in the letter his understanding that Loren's attorney had confirmed the arrangement with Gary's attorney, and invited questions or corrections if the letter did not properly memorialize the terms of the agreement.  Gary offers no record evidence that he objected to the agreement at the time it was made, and he silently accepted payments for the next three years (after which the trial court characterized the payments as "consulting fees").  For these reasons, we find unpersuasive his assertion that he was not party to the agreement.

[22] Although the trial court suggested that either Gary or Loren could offer to buy the other's shares in order to initiate stock sale proceedings under the shareholder agreement, the company and the other shareholders would be free to decline to buy those shares, and the deadlock that exists with the voting preferred stock would remain even if one of the plaintiffs bought the shares of the other plaintiff.

broken or to order the company dissolved and liquidated." In October 2010, defendants filed a motion for dissolution.[23] The trial court has consistently declined to dissolve the company because of its profitability and out of respect for the vision of the parties' parents to create a successful business that would provide financial security for their children. As admirable as these impulses may be, given the unique circumstances of this case, we believe it is time to give the parties what they have requested. Accordingly, we remand this matter to the circuit court so that the court may order dissolution of the company.

Affirmed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ Peter D. O'Connell
/s/ Jane M. Beckering

---

[23] Defendants later claimed to withdraw this request, but then tacitly reasserted it in their brief to this Court.